[No. G033455. Fourth Dist., Div. Three. June 8, 2005.]

IRVINE VALLEY COLLEGE ACADEMIC SENATE et al., Plaintiffs and Appellants, v.
BOARD OF TRUSTEES OF THE SOUTH ORANGE COUNTY COMMUNITY COLLEGE DISTRICT et al., Defendants and Respondents.

1484

### COUNSEL

Wendy Gabriella; Law Office of Carol A. Sobel and Carol A. Sobel for Plaintiffs and Appellants.

The Diepenbrock Law Firm, Karen L. Diepenbrock and Gene K. Cheever for Academic Senate for California Community Colleges as Amicus Curiae on behalf of Plaintiffs and Appellants.

Atkinson, Andelson, Loya, Ruud & Romo, Warren S. Kinsler and Aaron V. O'Donnell for Defendants and Respondents.

### OPINION

**MOORE, J.**—The Academic Senates of Irvine Valley College and Saddleback College (the Senates or appellants) appeal from the denial of a writ of mandate in favor of the Board of Trustees of the South Orange County Community College District (the Trustees) and Chancellor Raghu P. Mathur (collectively respondents). The dispute relates to the interpretation of Education Code section 87360 governing the process by which faculty hiring procedures are developed. We agree with appellants that the trial court incorrectly interpreted the relevant statute. We therefore reverse the judgment and remand for further proceedings consistent with this opinion.

## I

## FACTS

Irvine Valley College and Saddleback College are the two colleges in the South Orange County Community College District (the District). The Senates represent the faculty with respect to academic and administrative matters. (See Cal. Code Regs., tit. 5, § 53200, subd. (b).) The Trustees are the governing board of the District, responsible for maintaining and operating the colleges according to the law. (Ed. Code, § 70902.)

In April 2003, appellants sought a writ of mandate against respondents pursuant to Code of Civil Procedure sections 1085 and 1086. The petition alleged respondents violated subdivisions (b) and (c) of Education Code section 87360 (section 87360)[1] by adopting revised hiring policies that had not been "agreed upon jointly." The court agreed and stayed implementation of the policies until the Senates were given a real and meaningful opportunity to participate.[2]

After the trial court's initial ruling, representatives of the District and the Senates set to work on a new hiring policy. The trial court later found this process was undertaken in good faith and with diligence. Although agreement could be reached on some issues, some could not be resolved.[3]

The parties returned to court in December 2003. At that time, the trial court concluded that true agreement may not be possible and could not be statutorily required. The court read section 87360 to require the Senates to have a meaningful opportunity to participate in the process, but not to give them "a de facto veto or [the] ability to frustrate reform." Thus, the trial court

---

[1] Section 87360 was adopted in 1988. It states: "(a) In establishing hiring criteria for faculty and administrators, district governing boards shall, no later than July 1, 1990, develop criteria that include a sensitivity to and understanding of the diverse academic, socioeconomic, cultural, disability, and ethnic backgrounds of community college students. [¶] (b) No later than July 1, 1990, hiring criteria, policies, and procedures for new faculty members shall be developed and agreed upon jointly by representatives of the governing board, and the academic senate, and approved by the governing board. [¶] (c) Until a joint agreement is reached and approved pursuant to subdivision (b), the existing district process in existence on January 1, 1989, shall remain in effect."

[2] The Senates also asserted various constitutional challenges to the substance of the proposed policies. The trial court declined to rule on these challenges, finding that as proposed policies that had not yet been implemented, constitutional challenges were not yet ripe for adjudication.

[3] We need not address the areas of disagreement in detail, but some problematic areas included future amendments to the hiring policy, oversight of the hiring process, scoring potential candidates, and the selection of finalists.

denied the petition for a writ of mandate and entered judgment in favor of respondents. The Senates now appeal.

## II

## DISCUSSION

*Standing*

■ As a threshold matter, respondents argue appellants lack standing. First, they claim, appellants lack authority to sue or be sued because they have no legal existence separate from the districts of which they are a part. A body need not be formally organized to have standing; unincorporated associations may sue and be sued. (Code Civ. Proc., § 369.5.) Academic senates are recognized by statute and have been given specific responsibilities by the Legislature. In addition to section 87360, academic senates are explicitly recognized in Education Code sections 87359 and 87458, among other statutes. We find this statutory recognition, along with the coordinate rights and responsibilities conferred by the Legislature, sufficient to create a legal existence separate from the District.

■ Respondents also characterize the Senates as merely advisory bodies pursuant to the California Code of Regulations. Although the primary function of an academic senate is to make recommendations on a variety of matters, it is not the exclusive function. Section 53203, subdivision (a) of title 5 of the California Code of Regulations states: "The governing board of a community college district shall adopt policies for appropriate delegation of authority and responsibility to its college and/or district academic senate. Among other matters, said policies, at a minimum, shall provide that the governing board or its designees will consult collegially with the academic senate when adopting policies and procedures on academic and professional matters. This requirement to consult collegially shall not limit other rights and responsibilities of the academic senate which are specifically provided in statute or other Board of Governors regulations."

■ In addition to consulting and advising, an academic senate may have other "rights and responsibilities . . . which are specifically provided in statute . . . ." (Cal. Code Regs., tit. 5, § 53203, subd. (a).) Thus, we disagree with respondents that the decision to consult with the Senates on hiring policy is a matter requiring the District's agreement or is otherwise beyond the scope of the Senates' legal authority. ■ Section 87360 specifically grants the Senates a role in the process of developing a hiring policy.

Notwithstanding the responsibilities granted academic senates by section 87360, respondents claim the lack of express statutory standing demonstrates a "clear indication" that the Legislature did not intend academic senates to have independent standing. We disagree, and respondents offer no authority for the proposition that a lack of express statutory standing is fatal if the common law requirements of standing are otherwise present.

Respondents next assert that the Senates lack the necessary beneficial interest to obtain a writ because they are merely "advisory agencies" that do not exercise "the sovereign function of government." Respondents rely on *Laidlaw Environmental Services, Inc., Local Assessment Com. v. County of Kern* (1996) 44 Cal.App.4th 346 [51 Cal.Rptr.2d 666]. The petitioner in *Laidlaw* was a "local assessment committee" (LAC) formed by the county board of supervisors pursuant to Health and Safety Code section 25199.7. (44 Cal.App.4th at p. 349.) The committee sought a writ of mandate after the board of supervisors issued a conditional use permit to a waste management company. (*Id.* at pp. 350–351.)

The court held that the LAC did not have sufficient independence from the county to confer the beneficial interest necessary to confer standing. (*Laidlaw Environmental Services, Inc., Local Assessment Com. v. County of Kern, supra,* 44 Cal.App.4th at pp. 352–353.) The court found the LAC lacked "permanence and continuity" as well as the lack of authorization to exercise sovereign power. (*Id.* at p. 352.) Because the LAC's acted on an ad hoc basis and in a purely advisory role, they lacked the necessary beneficial interest.

■ Unlike the LAC in *Laidlaw,* academic senates are not appointed by the District. They are independently elected by the faculty of the community colleges they represent. (Cal. Code Regs., tit. 5, § 53202.) Further, they are not created on an ad hoc basis, but have permanence and continuity. Finally, academic senates have more than the extremely limited "advisory" role of an LAC. The statute at issue in this case demonstrates that proposition—the academic senate is one of two bodies which must jointly agree on a faculty hiring policy under section 87360. Thus, we find *Laidlaw* inapposite.

■ "The requirement that a petitioner be 'beneficially interested' has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large. [Citations.]" (*Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276].) A beneficial interest is "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large. [Citations.]" (*Ibid.*) Section 87360 explicitly states academic senates

have a key role in developing and adopting faculty hiring procedures, and this is a special right sufficient to confer a beneficial interest. If academic senates do not have sufficient standing to challenge a district's failure to comply with section 87360, it is difficult to envision who does. Given the specific attention the Legislature paid to the issue of developing faculty hiring policies, it is untenable to suggest nobody has standing to seek redress if a district violates this statute. Thus, we find the Senates have standing and proceed to address the substantive issue.

*Section 87360*

■ The parties agree that interpretation of a statute is a question of law subject to de novo review. (*Sutco Construction Co. v. Modesto High School Dist.* (1989) 208 Cal.App.3d 1220, 1228 [256 Cal.Rptr. 671].) The trial court construed section 87360 to mean that actual agreement between the Senates and the District was not required, holding this would result in an absurd interpretation of the statute.

■ We follow well-settled rules of statutory construction. "First, a court should examine the actual language of the statute. [Citations.] Judges, lawyers and laypeople all have far readier access to the actual laws enacted by the Legislature than the various and sometimes fragmentary documents shedding light on legislative intent. More significantly, it is the language of the statute itself that has successfully braved the legislative gauntlet. It is that language which has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed 'into law' by the Governor. The same care and scrutiny does not befall the committee reports . . . and other documents which make up a statute's 'legislative history.' [¶] In examining the language, the courts should give to the words of the statute their ordinary, everyday meaning [citations] unless, of course, the statute itself specifically defines those words to give them a special meaning [citations]. [¶] If the meaning is without ambiguity, doubt, or uncertainty, then the language controls. [Citations.] There is nothing to 'interpret' or 'construe.' [Citations.]" *Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238–1239 [8 Cal.Rptr.2d 298].)

"But if the meaning of the words is not clear, courts must take the second step and refer to the legislative history. [Citations.] [¶] The final step—and one which we believe should only be taken when the first two steps have failed to reveal clear meaning—is to apply reason, practicality, and common sense to the language at hand. If possible, the words should be interpreted to make them workable and reasonable [citations], practical [citations], in

accord with common sense and justice, and to avoid an absurd result [citations]." *Halbert's Lumber, Inc. v. Lucky Stores, Inc., supra,* 6 Cal.App.4th at pp. 1239–1240.)

■ The actual language of section 87360, subdivision (b), states: "No later than July 1, 1990, hiring criteria, policies, and procedures for new faculty members shall be developed and agreed upon jointly by representatives of the governing board, and the academic senate, and approved by the governing board." The literal language of the statute requires the faculty hiring policy, which is to be adopted by July 1, 1990, to be "agreed upon jointly." At a minimum, the plain language contemplates actual, affirmative agreement to the July 1, 1990 policy contemplated by the statute. "Agreed upon jointly" means what it says—joint agreement—not merely the opportunity to recommend or to participate in the process. In the event joint agreement cannot be reached, section 87360, subdivision (c) states: "Until a joint agreement is reached and approved pursuant to subdivision (b), the existing district process in existence on January 1, 1989, shall remain in effect."

Respondents agree that the "literal language" of section 87360 prescribes joint agreement, and in the event such agreement cannot be reached, the statute directs that the prior policy shall remain in place. They correctly point out that the statute does not explicitly state what is to happen *after* the initial policy is adopted. Thus, we must look to the legislative history to determine whether the Legislature intended the faculty, as represented by academic senates, to be an ongoing part of the hiring process.

The following statement of legislative purpose is included in the uncodified portion of the statute: "The Legislature finds and declares . . . [¶] . . . [¶] . . . each community college should, in a way that is appropriate to its circumstances, establish a hiring process that ensures that: (1) Emphasis is placed on the responsibility of the faculty to ensure the quality of their faculty peers. [¶] (2) Both faculty members and administrators participate effectively in all appropriate phases of the process. [¶] (3) Positions to be filled are normally identified through a well defined, thoughtful, planning process. [¶] . . . [¶] (8) Final hiring decisions are, whenever reasonably possible, made during the regular academic year and promptly communicated to the faculty; the expectation that faculty recommendations regarding the hiring of faculty will normally be accepted is reinforced; and only in exceptional circumstances,

and for compelling reasons communicated to the selection committee and to the president of the academic senate of the college, will someone be hired as a faculty member who has not been found to be among the best qualified by the faculty." (Stats. 1988, ch. 973, § 4(t), pp. 3093–3098.)

To respondents, this is not significant. They note the use of the word "should" in the first sentence, and therefore, construe faculty participation as optional. Yet the Legislature continued: "Faculty members derive their authority from their expertise as teachers and subject matter specialists and from their status as professionals. As a result, the faculty has an inherent professional responsibility in the development and implementation of policies and procedures governing the hiring process." (Stats. 1988, ch. 973, § 4(s)(3), p. 3097.) Not only did the Legislature intend to include the faculty in the hiring process itself, it intended they be included in the process of creating the procedures that would direct the hiring process. Nothing in the statement of legislative intent indicates an intent to include the faculty only once, at the time procedures under the statute were to be initially adopted prior to July 1, 1990.

Indeed, such a reading would directly contradict the Legislature's intent. If academic senates were only to be included in the process once, it would give a district carte blanche to go through the charade of including the academic senate, and then unilaterally change hiring policies at any time thereafter. Such an ability is in clear contrast to the Legislature's statement that the faculty has "an inherent professional responsibility" to develop and implement hiring policies and procedures. (Stats. 1988, ch. 973, § 4(s)(3), p. 3097.)

Respondents also urge us to compare draft language with the final adopted language and derive some legislative intent from those changes. We decline to do so. The uncodified portion of the statutory scheme includes clear statements about the Legislature's intent with regard to faculty participation, both in the hiring process and in the process of developing hiring processes and procedures. Given these clear statements of intent, we need not try to divine intent from changes in draft language that could have occurred for any number of reasons.

■ Thus, between the plain language of section 87360 and the legislative history of the statutory scheme, we conclude that the Legislature intended the faculty, through the academic senates, to have an ongoing role in developing and consenting to faculty hiring policies and procedures. In the event specific changes cannot be agreed upon, the existing policy would

remain in effect. In our view, this is the only reading of the statute that harmonizes both its plain language ("agreed upon jointly") and the legislative statement of intent (the faculty's "inherent professional responsibility" in developing hiring procedures).

Respondents argue that this interpretation grants the Senates a "veto" allowing them to obstruct and frustrate the process of revising hiring policies. They suggest various scenarios under which the Senates' refusal to agree to new procedures would require the District to, for example, ignore state law regarding hiring practices. These arguments are overblown. No reasonable reading of the statute suggests that the District would be required to follow an existing policy that clearly contradicted state law, even if the Senates would not agree to revise the policy accordingly. (There is no suggestion here that any existing policy contravened state law.) Nor is there any evidence that the Senates were acting out of malice or with an intent to obstruct the process. Indeed, the trial court found both parties were negotiating with good faith and diligence.

The bottom line is that the Legislature granted the Senates a role equal to the District's in developing and adopting faculty hiring policies. They undoubtedly contemplated a balance between the interests of each party and that compromise would be required. Respondents may feel this decision was unwise and are free to seek a change in the law, but the law on the books is what this court must follow. We therefore reverse the judgment and remand this matter to the trial court for further proceedings consistent with this opinion. We note that the parties and the public would be better served if the matter could be resolved by further negotiation or some form of dispute resolution, rather than continuing to spend scarce public resources to litigate the matter further. Indeed, perhaps a "joint agreement" could finally be reached.

*Attorney Fees*

The Senates request attorney fees pursuant to Code of Civil Procedure section 1021.5, but given the reversal of the judgment and remand for further proceedings, this request is premature. Moreover, the issue has not been fully briefed by either side. Once a new judgment has been entered, pursuant to a properly noticed motion, the trial court shall determine appellants' entitlement to attorney fees in both the trial court and on appeal, and if fees are appropriate, the amount of such an award.

## III

## DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion. Appellants are entitled to costs on appeal.

Rylaarsdam, Acting P. J., and Bedsworth, J., concurred.

A petition for a rehearing was denied July 6, 2005, and respondents' petition for review by the Supreme Court was denied August 24, 2005.