[No. A108713. First Dist., Div. Three. Mar. 21, 2007.]

DIABLO VALLEY COLLEGE FACULTY SENATE, Plaintiff and
Appellant, v.
CONTRA COSTA COMMUNITY COLLEGE DISTRICT et al., Defendants
and Respondents.

## COUNSEL

Law Offices of Robert J. Bezemek, Robert Bezemek and Patricia Lim for Plaintiff and Appellant.

Diepenbrock Harrison, Karen L. Diepenbrock, Gene K. Cheever and Lara M. O'Brien for Academic Senate for California Community Colleges as Amicus Curiae on behalf of Plaintiff and Appellant.

Shupe and Finkelstein and John A. Shupe for Defendant and Respondent Contra Costa Community College District.

Bill Lockyer, Attorney General, Jacob A. Appelsmith, Assistant Attorney General, Miguel A. Neri, Fiel Tigno and Karen Donald, Deputy Attorneys General, for Defendant and Respondent Chancellor of the California Community Colleges.

Bonifacio Bonny Garcia and Nitasha K. Sawhney for The Community College League of California as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**McGUINESS, P. J.**—This case concerns whether the Education Code or applicable regulations required a community college district to engage in collegial consultation with a college's academic senate before effecting an administrative reorganization. In September 2001, the president of Diablo Valley College (DVC) announced that, as part of a districtwide reorganization, professional deans would be hired for managerial positions previously filled on a part-time basis by faculty members. The Diablo Valley College

Faculty Senate (Faculty Senate) complained this change could not be under- taken without its consent, based on regulations requiring collegial consulta- tion for policies relating to "academic and professional matters." (Cal. Code Regs., tit. 5, §§ 53200, 53203, subd. (a).)[1] After several unsuccessful com- plaints to the Chancellor of the California Community Colleges (Chancellor), which resulted in a series of legal opinions from the Chancellor conclud- ing the reorganization did not impose a duty of collegial consultation, the Faculty Senate filed a petition for writ of mandate against the Contra Costa Community College District (District) and its governing board (Board) and a complaint for declaratory relief against the Chancellor. The trial court agreed that the regulations did not require collegial consultation and denied relief. As the third neutral entity to evaluate the question, we reach the same conclusion and affirm the judgment.

## BACKGROUND

### I. *History of DVC Division Chairs and the Change to Professional Deans*

With an annual enrollment of approximately 35,000 students, DVC is one of the largest community colleges in northern California, and it is one of three colleges managed by the District. Beginning in approximately 1968, DVC employed faculty "division chairs" to manage the various academic divisions within the college.[2] Division chairs were nominated by a majority vote of full-time faculty members within each division and then appointed to the position by the university president. Selected faculty members served up to two consecutive three-year terms as division chair and continued to teach part-time during this period. At the end of his or her service, a division chair generally resumed full-time teaching responsibilities. Division chairs acted as first-line managers for their divisions. They facilitated communications be- tween faculty and administrators and managed most aspects of the faculty's involvement in college administration.

The division chair management system at DVC was first memorialized in writing in June 1977, when it was added to the District's administrative procedures manual as "AP 4111.07." The District moved this provision into different manuals over the years, but the description of division chair selection procedures and responsibilities remained substantively unchanged. The parties dispute whether any of these acts were accompanied by collegial consultation and whether the Board ever formally adopted AP 4111.07 or its successors.

In addition, in 1982 or 1983, a description of the procedure for selecting division chairs was added to the collective bargaining agreement (CBA) between the District and its United Faculty, the union representing faculty

---

[1] All unspecified section references are to title 5 of the California Code of Regulations.

[2] "Division" refers to an aggregate of related academic disciplines.

members in District colleges. The CBA identifies division chairs as "management positions." The significance of this description's appearance in the CBA is another subject of dispute between the parties.

In the spring of 2001, the chancellor of the District (Charles Spence) determined it would be advantageous for colleges in the District to switch from the division chair system, which all three were using, to full-time management by professional administrators. In accordance with this decision, on September 14, 2001, DVC President Mark Edelstein sent a memorandum to all faculty and staff advising them of the upcoming change. Because of the school's high enrollment and almost year-round instructional calendar, Edelstein explained it had become increasingly difficult for the college to manage its affairs effectively using part-time faculty division chairs, who worked for only nine months of the year and served relatively brief terms.

## II. *Opinions of the State Chancellor and Legal Proceedings*

Although the change from division chairs to professional deans was accepted at other colleges in the District, it was controversial at DVC. On September 28, 2001, the Faculty Senate filed a formal complaint with statewide Chancellor Thomas J. Nussbaum arguing state regulations required the District to consult collegially with DVC faculty before implementing the proposed reorganization.[3] Specifically, the Faculty Senate maintained that the reorganization was an "academic [or] professional matter[]" requiring consultation (§ 53203, subd. (a)) because it would alter faculty roles in governance (§ 53200, subd. (c)(6)). For such matters, Board policy required the District to reach "mutual agreement" with faculty before they could legally make the change.

The Chancellor has statutory responsibility for establishing "minimum conditions" and ensuring these conditions are met at state community colleges as a prerequisite of their receipt of state funding. (Ed. Code, § 70901, subd. (b)(6).) One "minimum condition" is the requirement of collegial consultation with academic senates under certain defined circumstances. (§§ 51023, 53200, 53203.) The Chancellor treated the Faculty Senate's September 2001 letter (and subsequent letters) as a minimum conditions complaint triggering the office's duty to investigate, and on October 23, 2001, he issued the first of several legal opinions addressing the proposal to replace division chairs with full-time deans.

Legal opinion L 01-26 reported that the Board had tabled the proposed change for 90 days to allow for continuing informal discussions between the

---

[3] Mr. Nussbaum served as Chancellor from May 1996 to January 17, 2004. The current statewide Chancellor is Marshall Drummond.

DVC faculty and administration. Because the Board had taken no action to implement the reorganization, the Chancellor observed a formal complaint about the lack of collegial consultation was "technically premature." Nevertheless, in order to provide guidance, the Chancellor identified specific changes that might require collegial consultation if they were implicated by the District's actions, but he also repeated the general rule—set forth in his September 1997 advisory opinion on shared governance (legal opinion M 97-20)—that mere changes to a District's administrative organization do not require collegial consultation. The Chancellor issued a second opinion almost a month later. Legal opinion L 01-31 (Nov. 15, 2001) repeated the prior opinion's conclusion that changes in the District's management structure "might" require collegial consultation if they could be construed as affecting faculty roles in governance. However, consultation would not be required if the change was merely to a past practice rather than to a policy. In addition, because the division chair practice was outlined in the CBA with United Faculty, the Chancellor believed collegial consultation would be inconsistent with a regulation exempting the provisions of collective bargaining agreements from such consultation obligations (§ 53204).

The Board formally approved the replacement of DVC's division chairs with full-time deans in December 2001, and the Faculty Senate renewed its complaint with Chancellor Nussbaum. On July 22, 2002, the Chancellor issued an exhaustive opinion (legal opinion O 02-19) reviewing all aspects of the District's reorganization, including the change from division chairs to deans. He concluded the regulations require collegial consultation only for "matters that go to the heart of faculty expertise," based on "their expertise as teachers and subject matter specialists and their professional status." Consistent with this understanding, the Chancellor's office had developed a general rule that management reorganizations do not require collegial consultation, and the Chancellor discerned no reason to depart from this rule with regard to the District's reorganization. Specifically, because the reorganization concerned only management of the colleges, it did not affect "governance structures . . . related to faculty roles" (§ 53200, subd. (c)(6)). The Chancellor also found that the faculty's role in selecting division chairs was established through the collective bargaining process, and collegial consultation on the matter was therefore precluded.

On January 8, 2003, the Faculty Senate filed a petition for writ of mandate (Code Civ. Proc., § 1085) against the District and the Board and a complaint for declaratory relief against the Chancellor. Later in January 2003, counsel for the Faculty Senate sent a letter to Chancellor Nussbaum advising him that the senate had just discovered the existence of a District policy for the selection of division chairs. This policy, which counsel represented had been in effect for many years, was contained in the District's Curriculum and Instruction Procedures Manual. The Chancellor responded with a fourth

opinion. In legal opinion O 03-13 (May 2, 2003), the Chancellor observed that, just like AP 4111.07, there was no evidence the provision in question was ever adopted by the Board.[4] The Chancellor therefore continued to maintain collegial consultation was not required, and he reiterated his additional conclusions that the division chair procedure was not an "academic or professional matter" requiring consultation (§ 53200, subd. (c)) and that the parties' CBA precluded such consultation.

After a hearing, on October 13, 2004, the trial court entered an order denying the petition for writ of mandate and denying "all relief requested in the complaint for declaratory relief." The court rejected respondents' arguments about the absence of a Board policy, interpreting the collegial consultation regulations as "applying to established practices, as well as to formally approved policies." Further, the court found the District and Board were estopped from denying that the division chair structure was an approved policy by their knowledge and approval of this job description over the years, through various policy and procedure manuals. The court also rejected respondents' assertion that the CBA precluded collegial consultation, based on a finding that neither side intended the CBA to be binding on the subject of the division chair management structure.[5] However, the trial court agreed with respondents that the regulations did not require collegial consultation because the switch from division chairs to deans did not implicate "district and college governance structures, as related to faculty roles" (§ 53200, subd. (c)(6)). The court interpreted the regulations as requiring collegial consultation only when a change in a college's governing structure diminishes the faculty's ability to perform their unique "faculty roles," as opposed to roles they might serve in management.

## DISCUSSION

In mandate and declaratory relief proceedings, we defer to the trial court's findings of fact if they are supported by substantial evidence. (*Franzosi v. Santa Monica Community College Dist.* (2004) 118 Cal.App.4th 442, 447 [13 Cal.Rptr.3d 25]; *Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, 974 [97 Cal.Rptr.2d 280].) Where, as here, the material facts are undisputed, the trial court's interpretation of the Education Code is subject to de novo review. (*Franzosi v. Santa Monica Community College Dist., supra,* 118 Cal.App.4th at p. 447.)

█ The District and the Chancellor, respondents herein, both adopt the trial court's interpretation of the applicable regulations. In addition, both liken

---

[4] Indeed, the curriculum and instruction provision was simply one of several successive versions of the procedure originally described in AP 4111.07.

[5] The court also observed this provision could not have been a negotiable term in the CBA because modification of a management structure was exclusively a management prerogative.

the Chancellor's office to a state agency and argue the Chancellor's interpretation of the regulations must be accorded deference unless it is clearly erroneous. The District repeats several alternative arguments that the trial court rejected (concerning the Faculty Senate's standing, lack of a Board-approved policy, and the provision regarding division chairs in the CBA) and adds a new claim that the collegial consultation regulations are invalid because they exceed the shared governance authority granted to academic senates by the Legislature. We do not address these alternative arguments because we agree with the trial court's conclusion that the regulations did not require collegial consultation for the specific management reorganization implemented at DVC.

## I. *Legislative and Regulatory Framework*

In 1988, the Legislature enacted Assembly Bill No. 1725 (1987–1988 Reg. Sess.) (Assembly Bill 1725), which provided for substantial changes in the administration and governance of the state's community colleges.[6] (Stats. 1988, ch. 973, §§ 1–72, pp. 3087–3144.) Assembly Bill 1725 established a statewide board of governors and charged this body with establishing minimum standards to govern academic matters, hiring, administration and governance. (Stats. 1988, ch. 973, § 8, pp. 3102–3105.) Among several other additions and amendments to the Education Code, newly added Education Code section 70901, subdivision (b)(1)(E) required the statewide board of governors to establish: "Minimum standards governing procedures established by governing boards of community college districts to ensure faculty, staff, and students the right to participate effectively in district and college governance, and the opportunity to express their opinions at the campus level and to ensure that these opinions are given every reasonable consideration, and the right of academic senates to assume primary responsibility for making recommendations in the areas of curriculum and academic standards." (Stats. 1988, ch. 973, § 8, pp. 3102, 3103.)

 With input from the statewide academic senate, the state Chancellor's office and others, the statewide board of governors promulgated regulations to implement this "minimum standards" directive for shared governance. The regulations direct the governing boards of local community college districts to adopt policies for delegating authority to academic senates. Such a policy must provide, at a minimum, "that the governing board or its designees will consult collegially with the academic senate when adopting policies and procedures on academic and professional matters." (§ 53203, subd. (a).)

---

[6] We grant the Chancellor's request for judicial notice of legislative history concerning Assembly Bill 1725. Other requests for judicial notice, filed by the Faculty Senate and amicus curiae Academic Senate for California Community Colleges, are denied because they concern arguments not addressed in this opinion.

"Academic and professional matters" are defined exclusively as: "(1) curriculum, including establishing prerequisites and placing courses within disciplines; [¶] (2) degree and certificate requirements; [¶] (3) grading policies; [¶] (4) educational program development; [¶] (5) standards or policies regarding student preparation and success; [¶] (6) district and college governance structures, as related to faculty roles; [¶] (7) faculty roles and involvement in accreditation processes, including self-study and annual reports; [¶] (8) policies for faculty professional development activities; [¶] (9) processes for program review; [¶] [and] (10) processes for institutional planning and budget development. . . ." (§ 53200, subd. (c).) Beyond these 10 subjects, collegial consultation may also be required for "other academic and professional matters . . . mutually agreed upon between the governing board and the academic senate." (§ 53200, subd. (c)(11).)

Collegial consultation may take either of two forms, as decided by each local district. With respect to a particular subject, the district may decide to "rely primarily upon the advice and judgment of the academic senate," in which case, absent exceptional circumstances, "the recommendations of the senate will normally be accepted." (§ 53203, subd. (d)(1).) Or, the district may elect to require "mutual agreement" with the academic senate for certain subjects. In such cases, when an agreement is not reached, "existing policy shall remain in effect unless continuing with such policy exposes the district to legal liability or causes substantial fiscal hardship." (§ 53203, subd. (d)(2).)

In accordance with these regulations, the District's Board adopted Board policy 1009, which stated that the Board would consult collegially with the District's academic senate "when adopting policies and procedures on academic and professional matters as defined in Title 5, Section 53200 (c)." Board policy 1009 sets forth the same categories of "academic and professional matters" defined in section 53200, subdivision (c), and it provides that the Board will "rely primarily upon the advice and judgment" of the academic senate with respect to curriculum, degree requirements and grading, and will "reach mutual agreement" with the academic senate with respect to all other categories.

## II. *Collegial Consultation Not Required for Administrative Reorganization*

As discussed, local community college districts must consult collegially with faculty senates only with regard to specific "academic and professional matters." (§ 53203.) No one has suggested the parties here had a preexisting agreement to consult collegially about the administrative reorganization that occurred at DVC; thus, the question comes down to whether the reorganization comes within one of the categories enumerated in section 53200, subdivision (c). The only potentially relevant category in section 53200, as all

parties recognize, is subdivision (c)(6), which identifies "district and college governance structures, as related to faculty roles," as an academic and professional matter requiring collegial consultation.

### A. *Weight to Be Accorded the Chancellor's Opinions*

Although the final responsibility for interpreting a statute or regulation rests with the court, judicial deference must often be accorded to the construction applied by an agency charged with the law's administration and enforcement. (*Whitcomb Hotel, Inc. v. Cal. Emp. Com.* (1944) 24 Cal.2d 753, 756–757 [151 P.2d 233]; *Spanish Speaking Citizens' Foundation, Inc. v. Low* (2000) 85 Cal.App.4th 1179, 1214 [103 Cal.Rptr.2d 75] (*Spanish Speaking Citizens*).) " 'The appropriate degree of judicial scrutiny in any particular case is perhaps not susceptible of precise formulation, but lies somewhere along a continuum with nonreviewability at one end and independent judgment at the other.' [Citation.] Quasi-legislative administrative decisions are properly placed at that point of the continuum at which judicial review is more deferential; ministerial and informal actions do not merit such deference, and therefore lie toward the opposite end of the continuum." (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 575–576 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

The parties dispute how much weight, if any, we should accord the Chancellor's interpretation of section 53200, subdivision (c)(6). When he was general counsel for the statewide board of governors, Chancellor Nussbaum personally participated in drafting the regulations at issue in this case. Then, as Chancellor, he assumed responsibility for enforcing these regulations, including the statutory requirement that colleges satisfy certain "minimum conditions" as a condition of receiving state aid.[7] Respondents analogize the Chancellor's office to an administrative agency and cite case law holding an agency's interpretation of its own regulations is controlling unless it is plainly erroneous or unauthorized. (*Calderon v. Anderson* (1996) 45 Cal.App.4th 607, 613 [52 Cal.Rptr.2d 846]; *Lusardi Construction Co. v. California Occupational Safety & Health Appeals Bd.* (1991) 1 Cal.App.4th 639, 645 [2 Cal.Rptr.2d 297].) While no precedent directly addresses this situation, a rule affording such great deference to legal opinions issued by the Chancellor's office appears to be precluded by *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*).

In *Yamaha*, the Supreme Court distinguished between the level of judicial deference to be accorded to quasi-legislative acts, in which an agency

---

[7] This authority was delegated to the Chancellor by the statewide board of governors pursuant to Education Code section 70901, subdivision (d).

exercises its delegated lawmaking power, as compared with interpretive acts, in which an agency interprets the meaning or legal effect of a statute or regulation. (*Yamaha, supra,* 19 Cal.4th at pp. 7, 10–11.) Whereas courts are bound by an agency's rulemaking, so long as it is authorized by the enabling legislation, "the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Id.* at p. 7.) Here, we are considering the Chancellor's interpretation of a regulation, as opposed to his quasi-legislative act in drafting the regulation itself. "The level of deference due to an agency's regulatory interpretation turns on a legally informed, commonsense assessment of its merit in the context presented. [Citation.]" (*State Farm Mutual Automobile Ins. Co. v. Quackenbush* (1999) 77 Cal.App.4th 65, 71 [91 Cal.Rptr.2d 381].) More specifically, the Supreme Court has proffered "two broad categories of factors relevant to a court's assessment of the weight due an agency's interpretation: Those 'indicating that the agency has a comparative interpretive advantage over the courts,' and those 'indicating that the interpretation in question is probably correct.' [Citations.]" (*Yamaha, supra,* 19 Cal.4th at p. 12.) Both of these factors weigh in favor of according the Chancellor's decision some deference.

■ An agency has a potential interpretive advantage over the courts if it has developed a specialized expertise, " 'especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion.' " (*Yamaha, supra,* 19 Cal.4th at p. 12.) Although the specific regulations at issue are not highly technical, they are part of a complex regulatory system of shared governance that is very familiar to the Chancellor's office but essentially foreign to the courts. " 'A court is more likely to defer to an agency's interpretation of its own regulation than to its interpretation of a statute, since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.' [Citation.]" (*Ibid.*) As is apparent from declarations and other opinions in the record, the Chancellor's office routinely issues opinions advising colleges and academic senates about whether collegial consultation is required for specific changes in policy or procedure. Because the Chancellor is thus " 'immersed in administering' " the collegial consultation regulations, he can be expected to have " 'an intimate knowledge of the problems dealt with in the [regulations] and the various administrative consequences arising from particular interpretations. In contrast, a generalist court that visits a particular regulatory statute only infrequently lacks the advantage arising out of specialization.' " (*Spanish Speaking Citizens, supra,* 85 Cal.App.4th at p. 1215, quoting Asimow, *The Scope of Judicial Review of Decisions of California Administrative Agencies* (1995) 42 UCLA L.Rev. 1157, 1195–1196.)

With respect to whether an agency's decision is " 'probably correct' " (*Yamaha, supra,* 19 Cal.4th at p. 12), factors suggesting such correctness include (1) indications that the interpretation was carefully considered by senior agency officials; and (2) evidence that the agency has consistently maintained its interpretation, especially over a long period of time. (*Id.* at pp. 12–13; *Spanish Speaking Citizens, supra,* 85 Cal.App.4th at p. 1215.) The Chancellor issued four legal opinions addressing the issues in this case. These opinions, especially the final two, contain exhaustive analyses of the Faculty Senate's complaints, and they were drafted by the Chancellor's chief legal counsel. It is hard to envision evidence of a more careful consideration than occurred here.

The record also demonstrates that the Chancellor has maintained a consistent interpretation of the phrase "district and college governance structures, as related to faculty roles" (§ 53200, subd. (c)(6)). In 1997, the Chancellor issued an advisory opinion addressing several questions about the shared governance regulations. One question asked, "Must the district consult collegially on the administrative organization chart of the college?" The Chancellor answered, "No. Neither the governing board nor its designee(s) are required to 'consult collegially' with the academic senate regarding organization of the district administration, but the board would certainly have the discretion to do so if it wished."[8] The following year, the Chancellor applied this interpretation to a specific set of facts when he addressed a reorganization proposed by the Los Angeles Community College District. In response to the Los Angeles district's claim that collegial consultation was not required, the Chancellor's July 2, 1998 opinion explained: "A particular change in the administrative organization of a district may or may not affect academic and professional matters; but if it does, the governing board would have an obligation to consult with the academic senate before approving the change in administrative structure. In other words, a district is free to revise its administrative organization chart without consulting the academic senate, but if the changes in administrative structure also implicate academic and professional matters then there is an obligation to consult collegially before the policy is adopted." The Chancellor concluded the Los Angeles reorganization went "well beyond merely changing the administrative organization" of the district. In addition to changing fiscal planning and budgeting processes, the reorganization affected "faculty roles in governance" because it altered the local district's procedures for determining curriculum. Here, because the

---

[8] The Chancellor added that, although collegial consultation was not required, it would "probably be a good practice" for the district to inform faculty, staff and students and solicit their views before finalizing a reorganization. The record indicates the District took part in extended informal discussions with DVC faculty before it implemented the reorganization.

District's switch from division chairs to deans is a much narrower reorganization and does not affect curriculum or other academic matters, the Chancellor's current interpretation of section 53200, subdivision (c)(6) is consistent with his opinion in the Los Angeles case that collegial consultation is required only when an administrative reorganization affects academic and professional matters.

Accordingly, we conclude some weight should be afforded to the Chancellor's consistent interpretation that section 53200, subdivision (c)(6) does not require collegial consultation for management reorganizations, and to his carefully considered opinion that the District was not required to consult collegially before implementing the reorganization at issue in this case. However, this conclusion does not relieve us of the obligation to interpret the meaning of the regulation ourselves. "Whatever the force of administrative construction, however, final responsibility for the interpretation of the law rests with the courts. 'At most administrative practice is a weight in the scale, to be considered but not to be inevitably followed. . . . While we are of course bound to weigh seriously such rulings, they are never conclusive.' [Citation.]" (*Whitcomb Hotel, Inc. v. Cal. Emp. Com., supra*, 24 Cal.2d at p. 757.)

### B. *De Novo Review Supports Chancellor's Interpretation*

■ Rules governing the interpretation of statutes also apply to interpretation of regulations. (*Spanish Speaking Citizens, supra*, 85 Cal.App.4th at p. 1214.) "In interpreting regulations, the court seeks to ascertain the intent of the agency issuing the regulation by giving effect to the usual meaning of the language used so as to effectuate the purpose of the law, and by avoiding an interpretation which renders any language mere surplusage. [Citation.]" (*Modern Paint & Body Supply, Inc. v. State Bd. of Equalization* (2001) 87 Cal.App.4th 703, 708 [104 Cal.Rptr.2d 784].)

The Chancellor determined the reorganization at issue in this case did not require collegial consultation because the District's administrative organization could not be construed as a "district [or] college governance structure[]" (§ 53200, subd. (c)(6)). Unlike curriculum committees or budget committees, which clearly function in college governance, the Chancellor concluded the process of choosing managers of various college divisions is administrative in nature. This conclusion is reasonable, and it is consistent with the preexisting rule that collegial consultation is not required for administrative reorganizations that do not impact academic matters, such as curriculum.

■ Moreover, without regard to whether management by division chairs or deans constitutes a "district or college governance structure," it seems

clear that this management system is not "related to faculty roles." As the trial court observed, the phrase "as related to faculty roles" in section 53200, subdivision (c)(6) acts as a limitation imposed on the general subject of "district and college governance structures." Thus, only when a district seeks to change aspects of such governance structures that are related to "faculty roles"—such as, for example, curriculum or faculty hiring committees—must it consult collegially with the faculty. The regulations do not define "faculty roles." However, all other "academic and professional matters" defined in section 53200, subdivision (c) concern subjects that are within the unique expertise of faculty members, as opposed to administrators or any other specialists. These matters concern the development of academic programs and curriculum (§ 53200, subd. (c)(1), (2), (4), (9)), assessment of students and their progress toward degrees (§ 53200, subd. (c)(2), (3), (5)), professional development for faculty (§ 53200, subd. (c)(8)), and institutional development with respect to accreditation, review of existing academic programs, future planning and budgeting (§ 53200, subd. (c)(7), (9), (10)). Consistent with these other defined "academic and professional matters," we construe the term "faculty roles" in subdivision (c)(6) as referring to the traditionally understood roles faculty members play in a college. Faculty members are uniquely qualified to instruct students and assess their work, to design and implement curriculum, to develop the college's educational offerings, and to address broader institutional issues such as accreditation and budgeting to the extent these issues depend upon or impact student instruction. No evidence in the record, however, suggests faculty members at DVC are uniquely qualified to manage their peers or to decide which management structure the college should use.

The Faculty Senate advances two arguments against this construction. First, the Facualty Senate argues the District's management structure is related to faculty roles because DVC faculty members previously had a "role"—i.e., a function they performed—in selecting their managers and occasionally serving as managers themselves. In other words, because, through long-standing practice, the DVC faculty once played a role in college management, no change in management affecting this role could be accomplished without collegial consultation. This interpretation renders the definition of "faculty roles" in section 53200, subdivision (c)(6) entirely contextual, dependent in any given case on the faculty's history of involvement in a particular area. Such a broad construction would undermine the independent statutory authority of local governing boards to manage the colleges in their districts. (Ed. Code, § 70902.) In addition, it could prove unworkable in practice if districts were required to engage in the formal process of collegial consultation for every administrative practice that marginally involved faculty. (See *Spanish Speaking Citizens, supra,* 85 Cal.App.4th at p. 1214 [court should consider consequences that might flow from a particular construction

in interpreting a statute or regulation].) In short, the faculty's past participation does not convert the District's reorganization of purely managerial positions into an "academic or professional matter" requiring collegial consultation.

Second, reaching back to legislative history, the Faculty Senate argues section 53200 must be interpreted broadly consistent with the purpose of Assembly Bill 1725, which was to expand the role of faculty in shared governance. However, the senate's characterization of Assembly Bill 1725 is far too narrow. This bill enacted comprehensive reforms of all aspects of the state's community college system, and we find no indication in the legislative history to support the Senate's view that a primary purpose of the statute was to increase faculty's ability to participate in purely administrative decisions concerning their colleges. On the contrary, among numerous other declarations, Assembly Bill 1725 stated: "It is the intent of the Legislature that the California Community Colleges be governed under an efficient and flexible system . . . . The Legislature recognizes that the California Community Colleges is a statewide system with common standards and practices governing local initiative and control. The Legislature therefore finds and declares that clarifying and strengthening the respective roles of the Board of Governors and the Chancellor of the California Community Colleges will enhance the efficiency and flexibility of the system." (Stats. 1988, ch. 973, § 3, p. 3093.) Thus, the Legislature envisioned clearly defined and enhanced powers for these administrators. With respect to shared governance, Assembly Bill 1725 stated: "It is a general purpose of this act to improve *academic quality*, and to that end the Legislature specifically intends to authorize more responsibility for faculty members in duties that are *incidental to their primary professional duties*." (Stats. 1988, ch. 973, § 4, pp. 3093, 3096, italics added.) This purpose of enhancing faculty responsibility "incidental to their primary professional duties" is consistent with the interpretation of section 53200, subdivision (c)(6) we reach here—i.e., districts must consult collegially with faculty for changes in college governance when such changes are related to the faculty's acknowledged areas of expertise. Although the Legislature clearly intended to expand the participation of faculty (and students) in college governance, the language of Assembly Bill 1725 does not indicate a legislative intent to encourage faculty involvement in purely administrative matters.[9]

---

[9] In its reply brief and at oral argument, the Faculty Senate urged us to rely on *Irvine Valley College Academic Senate v. South Orange County Community College Dist.* (2005) 129 Cal.App.4th 1482 [29 Cal.Rptr.3d 336] as a "mirror image" of this case. The *Irvine Valley* decision construed a specific statute, Education Code section 87360, which expressly requires a governing board to reach joint agreement with the academic senate in developing faculty hiring procedures. Based on this statute's language and legislative history,

## DISPOSITION

The judgment is affirmed. Appellant shall bear costs on appeal.

Parrilli, J., and Pollak, J., concurred.

A petition for a rehearing was denied April 6, 2007, and appellant's petition for review by the Supreme Court was denied June 27, 2007, S152199.

---

*Irvine Valley* concluded the Legislature intended academic senates to have a role in developing hiring procedures. (*Irvine Valley, supra,* 129 Cal.App.4th at pp. 1491–1492.) The court never considered the regulation before us, or whether, for purposes of this regulation, faculty have an acknowledged "role" in choosing their managers. *Irvine Valley* is also notable for its rejection of the community college district's argument that requiring a joint agreement with faculty would give academic senates an unfair "veto" in the process of creating hiring policies. (*Id.* at p. 1492.) Because we do not reach the District's argument that the collegial consultation regulations here give greater power to academic senates than is statutorily permitted, we have no occasion to consider the validity of *Irvine Valley*'s observations on this point.