[No. E046254. Fourth Dist., Div. Two. Nov. 19, 2009.]

MONICA SANCHEZ et al., Plaintiffs and Appellants, v.
STATE OF CALIFORNIA et al., Defendants and Respondents.

**COUNSEL**

Parker & Covert, Spencer E. Covert, Jonathan J. Mott and Michael T. Travis for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Douglas J. Woods, Assistant Attorney General, Jonathan K. Renner and Thomas M. Patton, Deputy Attorneys General, for Defendants and Respondents State of California, State Allocation Board, Office of Public School Construction, Arnold Schwarzenegger, Michael C. Genest and John Chiang.

Marsha Bedwell and Todd M. Smith for Defendant and Respondent Jack O'Connell.

**OPINION**

**MILLER, J.**—Nine minor school children, seven parents, the Val Verde Unified School District (the District), and the Board of Education of the Val Verde Unified School District (collectively referred to as Val Verde) sought a writ of mandate, as well as injunctive and declaratory relief against the State of California, the State Allocation Board (SAB), the Office of Public School

Construction (OPSC), Governor Schwarzenegger, state Department of Finance Director Michael C. Genest and State Controller John Chiang (collectively referred to as the State).[1] The writ petition and complaint resulted from a dispute between Val Verde and the State over construction costs for school facilities. The trial court denied Val Verde's petition for writ of mandate, and dismissed Val Verde's complaint.

Val Verde essentially makes eight contentions. First, Val Verde asserts that the SAB incorrectly interpreted Education Code section 17075.15[2] and California Code of Regulations, title 2, section 1859.81. Second, Val Verde contends that the SAB improperly applied California Code of Regulations, title 2, section 1859.81. Third, Val Verde essentially asserts that the SAB abused its discretion by concluding that money from certificates of participation (COP's)[3] should be included when calculating a school district's ability to fund school construction. Fourth, Val Verde contends that California Code of Regulations, title 2, section 1859.81 is invalid because the SAB exceeded its authority when enacting that regulation. Fifth, Val Verde asserts that substantial evidence does not support the finding that the District possessed $89 million in COP proceeds. Sixth, Val Verde contends that the School Facility Program is unconstitutional. Seventh, Val Verde asserts that the trial court erred by not making factual findings that were requested by Val Verde. Eighth, Val Verde asserts that the trial court erred by overruling Val Verde's evidentiary objections and sustaining the State's evidentiary objections. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### A.  *Legal Background*

We begin by providing a brief summary of the relevant statutory and regulatory scheme.

California established the State School Facilities Fund (the State Fund) to pay for school construction projects. (§§ 17070.40, subd. (a)(1), 17070.63, subd. (a).) It is the duty of the SAB to apportion money from the State Fund to eligible school districts (§§ 17070.35, subd. (a)(4), 17070.40, subd. (a)), and to determine which school districts are eligible to receive money from the State Fund (§ 17070.35, subd. (a)(3)).

---

[1] Jack O'Connell, California's superintendent of public instruction submitted a brief joining in the State's respondents' brief.

[2] All further statutory references are to the Education Code, unless otherwise indicated.

[3] COP's are debt instruments, which are typically secured by real property. (Ed. Code, § 17150; see also Gov. Code, § 5902, subd. (a).)

Typically, before the SAB apportions money from the State Fund, a school district must show that it has money from local sources to match the money granted from the State Fund. In other words, 50 percent of school construction money typically comes from local sources, and the other 50 percent is derived from the State Fund. (§ 17072.30.) However, there is an exception to this 50/50 rule, which is known as the financial hardship program: if a school district is not financially capable of providing the required matching funds, then the SAB may adjust or defer the amount of local money required for a school construction project. (§§ 17075.10, subd. (b), 17075.15, subd. (a).) When determining whether a school district has sufficient local funds, the SAB can consider the unencumbered funds in a district's facility accounts; however, the SAB may exclude funds encumbered for a specific capital outlay purpose, and other funds that are not reasonably available for the construction project. (Cal. Code Regs., tit. 2, § 1859.81, subd. (a).)

### B. *Facts*

We separate the facts into two sections. The first section presents the issues and procedural history of the SAB administrative hearing. The second section presents the facts related to the hearing at the trial court.

#### 1. *Administrative Hearing*

The District participated in the financial hardship program from 1999 through 2007. During that time, the District received $340,522,619 in financial hardship apportionments, constructed 24 new facilities, and modernized two other facilities. All but three of the District's construction projects received 100 percent funding from the State Fund, due to the District's financial incapacity. In 2006, the OPSC reviewed the District's finances to determine if the District had any money to contribute toward the construction of school facilities. During the financial review, the OPSC discovered that the District possessed approximately $25,476,433 in available net proceeds from COP's. Data from the State Treasurer's Office indicated that, since the District was admitted into the financial hardship program, the District had issued 12 COP's, totaling $402,470,000, which would provide total net proceeds in the approximate amount of $89,234,421.

The executive officer of the SAB (the Executive Officer)[4] alleged that, by not disclosing the COP's, the District gained a funding advantage of

---

[4] The report from which these facts are taken is entitled "Report of the Executive Officer." (Some capitalization omitted.) " 'Executive Officer' means the individual appointed by the Governor to direct the [OPSC], and who concurrently serves as Executive Officer to the [SAB]." (Cal. Code Regs., tit. 2, § 1859.2.) However, we note that the report was primarily authored by an operations manager for the fiscal services division of the OPSC.

$11,830,232, because the District would not have qualified for 100 percent financial hardship funding if the COP proceeds had been disclosed. Following these discoveries, the Executive Officer recommended that the SAB (1) find that the District failed to disclose material information about the COP's during prior financial hardship reviews; (2) direct the District to repay the $11,830,232, plus interest, for a total of $12,504,792; and (3) apply the total net COP proceeds of $89,234,421 as a local money contribution to the District's next construction project(s).

The District took the position that the proceeds from the COP's (1) were encumbered, and therefore, not reasonably available for the construction projects, and (2) were deposited into the District's general fund account, rather than its facility accounts, and therefore did not constitute available funds for construction. Essentially, the District asserted that the COP proceeds were encumbered because they were needed to fill the shortfall created between the construction money provided by the financial hardship program, and the money it "actually" took to build an adequate school. In other words, the District contended that the financial hardship program did not provide enough money to build an adequate school, and therefore, the District could not use the COP proceeds as matching funds, because it needed the money to finish the construction projects, which would be incomplete if the only money for the projects was the money from the State Fund. The District asserted that it had already spent approximately $20 million to fill the shortfall in the construction funding provided by the financial hardship program, and estimated that it would need to spend an additional $81.5 million to fill the funding gaps for construction projects that were in the planning stages.

The Executive Officer contended that the construction funds provided to the District through the financial hardship program were sufficient to build a complete school, but that the District wasted the funds by making unnecessary modifications in the midst of construction, such as adding skylights to an administrative office, and by building unnecessary facilities, such as a weight room at a high school. The Executive Officer argued that "any enhancements to a construction project should be borne by the District. If a district is receiving 100 percent financial hardship assistance from the State, any enhancements need to be built within the apportionment provided. Further, that any local funds made available should be used solely to offset the financial hardship assistance provided by the State."

The District contended that limiting construction funds to those provided by the State would lead to construction of "inadequate, incomplete schools," and that "children living in areas of limited resources will have to attend schools without libraries, multipurpose rooms, resource specialist spaces and other essential program support facilities." The District requested that the

SAB find that the COP proceeds used to supplement the money provided by the financial hardship program were "encumbered," and therefore, not available for a local matching funds contribution.

At the SAB meeting on July 25, 2007, a motion was made to deny the District's request, and to recommend that the $89,234,421 of COP revenue be deemed available for future school facility projects. The motion carried with nine votes in favor, and one abstention.

### 2. *Trial Court Hearing*

In a combined petition for writ of mandate and complaint for declaratory and injunctive relief, Val Verde requested that the trial court (1) declare the State's regulatory system for allocating financial hardship funds (Cal. Code Regs., tit. 2, § 1859.81, subd. (a)) to be invalid and unconstitutional for failing to avoid gross disparities in expenditures and education quality; (2) declare that COP funding was not "available" for local matching contributions, and that COP funding shall not be used by the state to offset future construction funding from the state; (3) issue preliminary and permanent injunctions ordering the State to stop following the allegedly invalid and unconstitutional regulatory system when allocating financial hardship funds; (4) grant a writ of mandate directing the State to stop following the allegedly invalid and unconstitutional regulatory system when allocating financial hardship funds; (5) issue preliminary and permanent injunctions directing the State to take all steps necessary to ensure that the apportionment of financial hardship funds is completed in a constitutional manner; and (6) order the State to reimburse the money the District paid to complete the various school construction projects.

The State opposed Val Verde's requests. The State contended that (1) Val Verde did not demonstrate the regulatory system was unconstitutional, because (a) Val Verde was not similarly situated to nonhardship schools, and (b) Val Verde did not demonstrate that funding from the financial hardship program was linked to a lower quality education; and (2) the definition of an " 'adequate' school" is a public policy question, not the basis for a lawsuit.

At the hearing on the petition and the complaint, the trial court remarked that the record did not reflect that Val Verde had received disparate treatment, because the record showed that other school districts had to scale back their school construction plans due to the amount of financial hardship funds granted to them. Therefore, the trial court concluded, "there's no suspect classifications" and "no indication that anybody's been selected out under any kind of equal protection analysis." The trial court found that the SAB did not abuse its discretion by deciding that the District's $89,234,421 of COP

revenue should be deemed "available" for future school facility projects. Consequently, the trial court denied the writ petition, as well as the requests for declaratory and injunctive relief.

## DISCUSSION

### A. *Statutory Interpretation*

Val Verde contends that the SAB erred by interpreting section 17075.15 and California Code of Regulations, title 2, section 1859.81, as allowing the SAB to deem money deposited in a general fund account to be "available" or "unencumbered." We disagree.

■ "As a starting point, the interpretation of an administrative regulation is subject to the same principles as the interpretation of a statute. [Citation.]" (*County of Sacramento v. State Water Resources Control Bd.* (2007) 153 Cal.App.4th 1579, 1586 [64 Cal.Rptr.3d 302].) " ' "When interpreting a statute our primary task is to determine the Legislature's intent. [Citation.] In doing so we turn first to the statutory language, since the words the Legislature chose are the best indicators of its intent." [Citations.] . . . " 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) . . . .' " [Citation.] However, the literal meaning of a statute must be in accord with its purpose as our Supreme Court noted in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 658–659 [25 Cal.Rptr.2d 109, 863 P.2d 179] as follows: "We are not prohibited 'from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the [statute] . . . .' " In *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299], our Supreme Court added: "The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. [Citations.] An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation] . . . ." The Supreme Court has held: " 'The courts must give statutes a reasonable construction which conforms to the apparent purpose and intention of the lawmakers.' [Citation.]" [Citation.] Further, the Supreme Court has held: "We have recognized that a wide variety of factors may illuminate the legislative design, ' "such as context, the object in view, the evils to be remedied, the history of the time and of legislation upon the

same subject, public policy and contemporaneous construction." ' [Citations.]" [Citation.]' [Citation.]" (*State of California ex rel. Nee v. Unumprovident Corp.* (2006) 140 Cal.App.4th 442, 446 [44 Cal.Rptr.3d 491]; see also *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276 [87 Cal.Rptr.2d 222, 980 P.2d 927].)

Our interpretation of a statute is typically subject to de novo review. (*Cequel III Communications I, LLC v. Local Agency Formation Com. of Nevada County* (2007) 149 Cal.App.4th 310, 316 [57 Cal.Rptr.3d 32].) Despite the similarities between interpreting statutes and regulations, an important difference between the interpretation of a statute and the interpretation of a regulation is that "we defer to an agency's interpretation of a regulation involving its area of expertise, ' "unless the interpretation flies in the face of the clear language and purpose of the . . . provision." [Citation.]' [Citation.]" (*County of Sacramento v. State Water Resources Control Bd., supra,* 153 Cal.App.4th at p. 1587.)

Section 17075.15, subdivision (c), provides that the SAB must adopt regulations defining "the amount, and sources, of financing that [a] school district could reasonably provide for school facilities as follows:

"(1) Unencumbered funds available in all facility accounts in the school district including, but not limited to, fees on development, redevelopment funds, sale proceeds from surplus property, funds generated by certificates of participation for facility purposes, bond funds, federal grants, and other funds available for school facilities, as the board may determine.

"(2) The board may exclude from consideration all funds encumbered for a specific capital outlay purpose, a reasonable amount for interim housing, and other funds that the board may find are not reasonably available for the project."

The pertinent regulation adopted by the SAB, regarding funding sources, is California Code of Regulations, title 2, section 1859.81, subdivision (a) (hereinafter sometimes the Regulation), which provides that a school district may qualify for the financial hardship program if it can demonstrate that "[t]he district is financially unable to provide all necessary matching funds for an eligible project. To determine this, an analysis shall be made of the district's financial records by the OPSC including data and records maintained by the [State Department of Education] and the County Office of Education. The analysis shall consist of a review of the district's latest Independent Audit regarding funds available from all capital facility accounts, including, but not limited to, developer fees, funds generated from capital facility certificates of participation, federal grants, redevelopment funds, sale

proceeds from surplus property, the appraised value of facilities approved for replacement pursuant to Section 1859.82, bond funds either encumbered, unencumbered or authorized but unsold, and savings from other SFP projects. All funds thus identified that have not been expended or encumbered by a contractual agreement for a specific capital outlay purpose prior to the initial request for financial hardship status shall be deemed available as a matching contribution. [¶] After the initial request for financial hardship status is granted, no further encumbrances will be approved by the OPSC and all prospective revenue made available to the district's capital facility accounts shall be deemed available as matching contribution on the subsequent financial hardship review . . . ."

The plain language of the Regulation is very specific—it reflects that a fiscal review shall consist of the "funds available from all *capital facility accounts*" (italics added), and that after a request for financial hardship status is granted, then "all prospective revenue made available to the district's *capital facility accounts* shall be deemed available . . ." (italics added). The Regulation speaks very narrowly of capital facility accounts, and does not mention matching funds being derived from any other type of account. Consequently, the plain language of the Regulation supports the conclusion that money from the District's general fund should not be considered "available" for a matching contribution.

■ Nevertheless, despite the plain language of the Regulation, the statutory and regulatory schemes reveal a different intention. Section 17072.30, subdivision (a), provides that the typical state contribution for school construction projects will be 50 percent; however, if a school district is financially incapable of paying its 50 percent share, then the state may make an exception to the rule and pay for 100 percent of the construction costs (Cal. Code Regs., tit. 2, § 1859.81). It is clear from this statutory scheme that the financial hardship exception was meant to assist school districts that do not have sufficient funds for constructing new schools, regardless of which account(s) the construction money was deposited into. In other words, the intent of the statutory and regulatory scheme is not to audit capital facility accounts, but to ensure that school districts that are not financially capable of affording new school facilities are able to construct the necessary buildings. (See Cal. Code Regs., tit. 2, § 1859.) Therefore, we can infer that it was not the intent of the Legislature or the regulatory body to limit consideration of "available" funds to those deposited into a capital facility account; rather, the intent was to include all money designated for construction purposes, regardless of which account it was deposited into.

■ In sum, a reasonable interpretation of the Regulation and related statutes is that all funds designated for constructing school facilities that were

not otherwise encumbered, should be deemed "available" for a school district's matching contribution, regardless of which account the funds were deposited into. Therefore, we conclude the SAB and the trial court properly construed the applicable statute and regulation.

Val Verde asserts that the foregoing interpretation of section 17075.15, subdivision (c)(1), renders the term " 'facility account' " surplusage, and therefore, such an interpretation must be avoided. Contrary to Val Verde's position, the term "facility account" will not become surplusage under the foregoing interpretation; rather, the term is given a broader meaning. Instead of referring to an account specifically labeled "facility account," under our interpretation the term refers to any account containing money for facilities. Accordingly, Val Verde's argument is unpersuasive.

Further, Val Verde's interpretation of the statute—that the SAB may only consider money in accounts labeled "facility account"—would essentially render section 17072.30, i.e., the 50/50 program, surplusage, because school districts that want to save local money would simply deposit all their construction funds into their general fund accounts so as to appear financially incapable of making a matching contribution. In sum, we do not find Val Verde's argument to be persuasive.

During oral argument, Val Verde stressed that the State's own consultant determined that the OPSC and SAB do not have jurisdiction over COP proceeds that are deposited in a school district's general fund. Val Verde relied on a document referred to as "The Macias Report" as evidence of the State's consultant's conclusion. As noted by the State during oral argument, The Macias Report was not before the trial court. In the trial court, Val Verde requested that the trial court take judicial notice of The Macias Report; however, the trial court denied the request. Consequently, we do not discuss Val Verde's argument concerning The Macias Report, because it was not raised in the trial court. (See *Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316 [88 Cal.Rptr.2d 758] [litigant may not assert a new theory on appeal].)

B.  *Application of the Regulation*

Next, Val Verde contends that, even if the SAB believes that construction money in the general fund account is "available," the SAB improperly applied the regulation because the COP proceeds were already encumbered for a specific capital purpose prior to the District's application for financial hardship status, and therefore, the funds could not be deemed "available."[5] We disagree.

---

[5] At oral argument, Val Verde mentioned several specific line item amounts that should have been considered "encumbered" by the SAB. For example, Val Verde faulted the SAB for not deeming encumbered the money the District spent excavating granite at one construction site,

The Regulation provides: "All funds . . . identified that have not been expended or encumbered by a contractual agreement . . . prior to the initial request for financial hardship status shall be deemed available as a matching contribution. [¶] After the initial request for financial hardship status is granted, no further encumbrances will be approved by the OPSC and all prospective revenue made available to the district's capital facility accounts shall be deemed available as [a] matching contribution on the subsequent financial hardship review . . . ."

"The question for the trial court and for us on appeal is the same: whether the local agency's decision is supported by substantial evidence. [Citation.] The burden is on appellant to show there is no substantial evidence to support the decision. [Citation.]" (*Fishback v. County of Ventura* (2005) 133 Cal.App.4th 896, 901–902 [35 Cal.Rptr.3d 199].)

The District was initially approved for financial hardship status in December 1999. Between 1999 and 2006, the District submitted subsequent applications to renew its financial hardship status, which we infer were approved. The record includes COP's with dates of October 1, 2003, April 1, 2005, July 1, 2005, and March 1, 2006. Accordingly, substantial evidence reflects that at least four COP's were issued several years after the District's initial request for financial hardship status was granted. Therefore, substantial evidence supports the finding that the COP proceeds were not encumbered, because the Regulation provides that after an initial request for financial hardship status is granted, no further encumbrances will be approved, and all revenue available for capital facility projects shall be deemed available on subsequent financial hardship reviews. (Cal. Code Regs., tit. 2, § 1859.81, subd. (a).) Consequently, the COP proceeds could not be deemed encumbered because that revenue was received after the District's initial request for financial hardship status was granted. In sum, we find no error.

█ Val Verde appears to take the position that each subsequent application for financial hardship status was independent of the previous application, and therefore, each application is the "initial" application. Accordingly, Val Verde essentially asserts that the COP proceeds were encumbered prior to the District's receiving financial hardship status. Contrary to Val Verde's position, the Regulation plainly reflects that subsequent applications are not independent or "initial" applications. Specifically, the Regulation provides: "*After* the *initial* request for financial hardship status is granted, *no further encumbrances* will be approved by the OPSC and all prospective revenue made

---

which was an unanticipated construction cost. We do not address the various line item arguments; rather we analyze Val Verde's general argument as presented *ante*.

available to the district's capital facility accounts *shall be deemed available* as [a] matching contribution on the *subsequent* financial hardship review . . . ." (Italics added.)

### C.  COP Funds

Next, Val Verde contends that the SAB abused its discretion by concluding that COP proceeds are the type of funds that should be included when calculating a school district's ability to make a matching contribution.

The interpretation of a statute or regulation is subject to de novo review. Additionally, as we noted *ante*, "the final responsibility for interpreting a statute or regulation rests with the court, [however,] judicial deference must often be accorded to the construction applied by an agency charged with the law's administration and enforcement." (*Diablo Valley College Faculty Senate v. Contra Costa Community College Dist.* (2007) 148 Cal.App.4th 1023, 1034 [56 Cal.Rptr.3d 294]; see *Matea v. Workers' Comp. Appeals Bd.* (2006) 144 Cal.App.4th 1435, 1444 [51 Cal.Rptr.3d 314].)

■ Subdivision (a) of the California Code of Regulations, title 2, section 1859.81, provides that an analysis of a school district's "available" funds shall include "funds available from all capital facility accounts, including, *but not limited to*, developer fees, *funds generated from capital facility certificates of participation*, federal grants, redevelopment funds, sale proceeds from surplus property, the appraised value of facilities approved for replacement pursuant to Section 1859.82, bond funds either encumbered, unencumbered, or authorized but unsold, and savings from other SFP projects." (Italics added.)

First, COP's are included in the plain language of the Regulation; section 17075.15, subdivision (c)(1), directs the SAB to adopt regulations defining the sources of school construction financing as including "funds generated by certificates of participation for facility purposes." Accordingly, it is reasonable to conclude that the Legislature intended for proceeds from COP's to be included in the calculation of a school district's financial capacity.

Second, the California School Finance Authority Act (§ 17170 et seq.) defines " '[b]onds' or 'revenue bonds' " as "bonds, notes, lease obligations, *certificates of participation*, commercial paper, and any other evidences of indebtedness." (§ 17173, subd. (d), italics added.) Because certificates of participation are included within the meaning of "[b]onds" under the California School Finance Authority Act, and bonds are included in the types of funds to be considered, we infer that the Legislature and the regulatory body intended for proceeds from COP's to be considered when analyzing whether a school district has funds "available" for a matching contribution.

Third, the list of funding sources plainly reflects that it is not limited to the sources explicitly included in the statute. Accordingly, even if COP's were not included in the list or considered to be "[b]onds," they could still be considered as a source of available funds, because the list is not exclusive.

Val Verde asserts that COP proceeds are not meant to be included in the calculation of "available" funds because, unlike the other sources on the list, COP revenues "are borrowed funds which must be repaid from the school district's own general fund revenues in the future." (Boldface omitted.) We do not find this argument persuasive because COP's are plainly included on the list of possible sources for matching contributions.

### D. *Excess of Authority*

Val Verde contends the Regulation is invalid because it is inconsistent with section 17075.15 (hereinafter sometimes the Statute), which is the enabling statute for the Regulation.[6] Specifically, Val Verde asserts that the Regulation exceeds the authority granted to the SAB because the Regulation requires COP proceeds received after a district is granted financial hardship status to be deemed "available"; Val Verde contends the Statute did not authorize the SAB to make this requirement regarding funds received after a grant of financial hardship status. Additionally, Val Verde contends that the Statute does not authorize the SAB to deem money in the District's general fund to be "available." We disagree.

"When determining whether a regulation comes within the scope of the authority a legislative body has delegated to an administrative agency, we do not defer to the agency's interpretation of the enabling statute but instead exercise our independent judgment. [Citation.] An administrative agency may not adopt a regulation that exceeds the scope of, or is inconsistent with, the enabling statute. [Citations.]" (*Bisno v. Santa Monica Rent Control Bd.* (2005) 130 Cal.App.4th 816, 821 [30 Cal.Rptr.3d 441].)

#### 1. *Revenue Received After a Grant of Hardship Status*

We begin by addressing Val Verde's contention related to the SAB's authority to define "available funds" as including COP proceeds received after a grant of initial hardship status.

Section 17075.15, subdivision (c)(1), directs the SAB to "define the amount, and sources, of financing that [a] school district could reasonably

---

[6] In their opening brief, Val Verde initially contends that section 17075.10 is also invalid; however, Val Verde does not make any further argument regarding this statute. Accordingly, we do not discuss section 17075.10.

provide for school facilities as follows: [¶] . . . Unencumbered funds available in all facility accounts in the school district including, *but not limited to*, fees on development, redevelopment funds, sale proceeds from surplus property, *funds generated by certificates of participation for facility purposes*, bond funds, federal grants, and other funds available for school facilities, *as the* [SAB] *may determine.*" (§ 17075.15, subd. (c)(1), italics added.)

■ The Statute (1) grants the SAB the authority to determine what funds should be considered available sources for financing, i.e., the language "as the [SAB] may determine," and (2) does not set forth an exclusive list of funding sources that the SAB must adhere to, i.e., the language "including, but not limited to." Accordingly, the Statute granted the SAB the authority to define "available funds" as including revenue received after a district is granted hardship status. Therefore, we conclude that the SAB did not act in excess of its authority when enacting the Regulation.

### 2. *General Fund*

Next, we review Val Verde's assertion that the SAB exceeded its authority by deeming money in the District's general fund to be "available."

■ Section 17075.15, subdivision (c)(1), directs the SAB to enact a regulation that allows matching funds to be taken from "facility accounts." The Statute makes no reference to a school district's general fund, and specifically limits any SAB accounting to a school district's facility accounts.

Nevertheless, as we concluded *ante*, it is clear from the statutory scheme that the financial hardship exception was meant to assist school districts that do not have sufficient funds for constructing new schools. Therefore, we can infer that it was not the intent of the Legislature to limit consideration of "available" funds to the money deposited into a capital facility account; rather, the intent was to consider all the money designated for construction purposes, regardless of which account it was deposited into. Consequently, given the intent of the Legislature, we conclude that the SAB did not act in excess of its authority by deeming money in the District's general fund to be "available."

### 3. *Punitive Actions*

In its opening brief, Val Verde makes a passing reference to the SAB acting "in a manner contrary to law" by ordering the District to repay the state; however, the statement is under an argument heading about statutory interpretation, and the assertion includes little analysis. In its reply brief, Val Verde contends that the SAB exceeded its authority by establishing and

enforcing punitive measures based on unreported money in the District's general fund, because the SAB does not have authority over a school district's general fund. In other words, Val Verde did not develop this argument in its opening brief. Therefore, we do not address this contention because "[i]t is not proper for an appellant to raise new points in a reply brief . . . ." (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1144 [61 Cal.Rptr.2d 207].)

### E.   *Amount of COP Proceeds*

Val Verde asserts that substantial evidence does not support the finding that the District possessed "$89 million" in available COP proceeds. We disagree.

Subdivision (a) of the California Code of Regulations, title 2, section 1859.81 authorizes "funds generated from capital facility certificates of participation" to be analyzed, and if not expended or encumbered, then the funds are to be deemed available as a matching contribution.

"Under the substantial evidence test, courts do not reweigh the evidence. They determine whether there is any evidence (or any reasonable inferences which can be deduced from the evidence), whether contradicted or uncontradicted, which, when viewed in the light most favorable to an administrative order or decision or a court's judgment, will support the administrative or judicial findings of fact. Administrative and judicial findings are presumed to be supported by the record; and orders, decisions and judgments are presumed to be correct. Persons challenging them have the burden of showing that they are not supported or correct. [Citations.]" (*Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 849, fn. 11 [75 Cal.Rptr.3d 887].)

The Report of the Executive Officer, which relies on data gathered from the Web site of the State Treasurer's Office, reflects that the District had issued 12 COP's since it was granted financial hardship status. The 12 COP's were valued at $402,470,000. From the $402,470,000, the Executive Officer deducted "the cost of borrowing, the amounts used to retire the prior COPs, and other eligible capital facility expenditures," to arrive at a total net proceeds amount of $89,234,421. The Executive Officer's analysis includes a list of COP's issued between 2003 and 2007, with the COP amount, COP series type, the date of issuance, and the net proceeds. The foregoing is evidence of ponderable legal significance, reasonable in nature, credible, and of solid value to prove that the District received approximately $89 million in net proceeds.

Val Verde asserts that the SAB should not have considered the full amount of the issued COP's when calculating "available" funds; rather, the SAB

should only include the COP proceeds. As explained *ante*, substantial evidence shows that the total amount of the issued COP's was $402,470,000, and the total amount of the net proceeds was $89,234,421. The SAB approved using $89,234,421 of the District's money for future construction costs. Accordingly, the SAB considered only the net proceeds to be "available"; and therefore, we find Val Verde's argument unpersuasive.

### F. *Constitutional Challenge*

Val Verde contends that the Regulation and the Statute are (1) facially unconstitutional, and (2) unconstitutional as applied.[7] We disagree.

The determination of the constitutionality of a statute and a regulation is a question of law. Accordingly, we apply the de novo standard of review. (*Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 360 [9 Cal.Rptr.3d 197] (*Bernardo*).)

### 1. *Facial Challenge*

We begin by addressing Val Verde's contention that the Regulation and the Statute are facially unconstitutional.

■ "[A] facial challenge is conducted as follows: 'A facial challenge to the constitutional validity of a statute or [regulation] considers only the text of the measure itself, not its application to the particular circumstances of an individual. [Citation.] " 'To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.' " [Citation.]' [Citation.]" (*U.D. Registry, Inc. v. State of California* (2006) 144 Cal.App.4th 405, 419 [50 Cal.Rptr.3d 647].)

Val Verde asserts that the Regulation and the Statute are facially unconstitutional because (1) the State has "not been distributing new school construction funds on an adequate basis per pupil for school districts in the financial hardship program"; (2) the State "conduct[s] and operate[s]" the financial hardship program in a manner that discriminates against low-income areas and high-population growth areas; and (3) the State "treats '50-50' and financial hardship districts differently . . . by penalizing financial hardship

---

[7] In its opening brief, Val Verde urges this court to find section 17075.10 unconstitutional as applied. However, Val Verde provides no argument regarding this section. Accordingly, we do not discuss section 17075.10.

districts" for contributing their local funds to construction projects. Val Verde contends that the disparate treatment "will result in an array of second-tier schools of limited quality and scope."

■ Val Verde's argument does not relate to the text of the Regulation or the Statute. Rather, Val Verde's argument focuses on the application of the Regulation, and sets forth a hypothetical concerning an "array of second-tier schools of limited quality and scope." Because Val Verde has not demonstrated that the Regulation and the Statute inevitably pose a present total and fatal conflict with applicable constitutional provisions, we do not find its contention persuasive.

## 2. *As-applied Challenge*

Next, we address Val Verde's contention that the Regulation and the Statute are unconstitutional as applied. Val Verde asserts that the Regulation and the Statute are unconstitutional as applied by the SAB because the SAB's enforcement of the Regulation has resulted "in [a] violation of [Val Verde's] rights under the Equal Protection Clause of the California Constitution."

■ The equal protection clause of our state Constitution forbids the state from denying a person equal protection of the law. (Cal. Const., art. I, § 7, subd. (a).) The clause prohibits the state from granting a citizen, or class of citizens, "privileges or immunities not granted on the same terms to all citizens." (Cal. Const., art. I, § 7, subd. (b); see also *Bernardo, supra*, 115 Cal.App.4th at pp. 364–365.) "Most laws which run afoul of the equal protection Clause discriminate explicitly between groups of people, but the Clause also might apply to laws which, though evenhanded on their face, in operation have a disproportionate impact on certain groups." (*Kim v. Workers' Comp. Appeals Bd.* (1999) 73 Cal.App.4th 1357, 1361 [87 Cal.Rptr.2d 382].) "But neither explicit discrimination nor discrimination by 'disparate impact' is unconstitutional unless motivated at least in part by purpose or intent to harm a protected group. [Citations.]" (*Id.* at pp. 1361–1362; see also *Genesis Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist.* (2003) 113 Cal.App.4th 597, 605 [6 Cal.Rptr.3d 574]; see also *Arlington Heights v. Metropolitan Housing Corp.* (1977) 429 U.S. 252, 270–271 [50 L.Ed.2d 450, 97 S.Ct. 555].)

■ First, the Regulation and the Statute do not explicitly discriminate between separate or distinct classifications of people, because the Regulation gives every school district in the state an opportunity to apply for financial hardship status. Second, Val Verde has made no showing that the Regulation and the Statute disproportionately impact a protected class of people. Val Verde argues that the District was disproportionately impacted because it was

penalized for inaccurately reporting its financial information; however, this is insufficient to show that the Regulation disproportionately affected a protected group.

Third, even if Val Verde had demonstrated that the Regulation and the Statute disproportionately impact a protected class, they offered no evidence of the Legislature's or regulatory body's purpose or intent to discriminate; and, the Regulation and the Statute negate any such claim of discriminatory intent. As concluded *ante*, the legislative intent behind the Regulation and the Statute is a desire to assist school districts that do not have sufficient funds for constructing new schools. Because Val Verde has not shown discrimination or a discriminatory intent, we conclude that the Regulation and Statute are not unconstitutional as applied.

Val Verde relies on *Butt v. State of California* (1992) 4 Cal.4th 668 [15 Cal.Rptr.2d 480, 842 P.2d 1240] (*Butt*), to support its position that the State has been violating Val Verde's constitutional rights by providing inadequate school construction funds to financial hardship districts. In *Butt*, a school district announced that it lacked sufficient funds to complete the final six weeks of the school term, and, therefore, proposed to close its schools six weeks early. (*Id.* at p. 673.) The superior court found, after an evidentiary hearing, that "an unplanned, early closure of schools in a particular district 'would have a real and appreciable impact on the affected students' fundamental California right to basic educational equality.' [Citation.]" (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 857–858 [39 Cal.Rptr.2d 21, 890 P.2d 43].) Consequently, the superior court issued a preliminary injunction directing the State of California to give an emergency loan to the school district, in order to ensure that the students would receive a full school term. (*Butt*, at p. 673.)

Our Supreme Court transferred the case to its jurisdiction to determine "[w]hether the State has a constitutional duty, aside from the equal allocation of educational funds, to prevent the budgetary problems of a particular school district from depriving its students of 'basic' educational equality." (*Butt, supra*, 4 Cal.4th at p. 674.) After examining a myriad of cases, our Supreme Court concluded that "the California Constitution makes public education uniquely a fundamental concern of the State and prohibits maintenance and operation of the common public school system in a way which denies basic educational equality to the students of particular districts." (*Id.* at p. 685.) In other words, our Supreme Court concluded that the state does have a duty to prevent a school district's budgetary problems from depriving students of basic education equality. (*Ibid.*)

We do not find *Butt* supportive of Val Verde's position. The State's obligation—to prevent a school district's budgetary problems from negatively

impacting students' constitutional right to educational equality—does not imply that the State is obliged to ignore capital facility funds that are placed in a general account, rather than in a capital facility account. Further, the State has created an administrative system for assisting school districts that unexpectedly incur more construction expenses than anticipated. The State complies with its duty to prevent financial problems from depriving students of basic education equality via California Code of Regulations, title 2, section 1859.83, which authorizes "excessive cost hardship grants" to be given to school districts that, due to unusual circumstances, incur excessive construction costs beyond the school district's control. Consequently, given (1) our analysis of *Butt*, and (2) the State's "excessive cost hardship grants," we are not persuaded that the State has violated Val Verde's constitutional rights.

Next, in their opening brief, under the heading related to the facial constitutionality of the Regulation and the Statute, Val Verde asserts that the Regulation and the Statute disproportionately impact "less affluent and minority children who live in high growth areas, such as Val Verde." To the extent Val Verde intended to make this assertion as part of their contention concerning the application of the Regulation and the Statute, rather than part of their facial challenge, we find the argument unpersuasive, because Val Verde still fails to show a discriminatory intent on the part of the Legislature or regulatory body.[8]

### G. *Findings of Fact and Evidentiary Rulings*

Val Verde asserts that the trial court erred by (1) not making requested findings of fact, and (2) sustaining the State's evidentiary objections, while overruling Val Verde's evidentiary objections. We disagree.

In its opening brief, Val Verde essentially sets forth a list of factual findings that the trial court did not make, despite Val Verde's requests; however, the opening brief does not explain how Val Verde was prejudiced by the trial court's failure to make the factual findings. In its reply brief, Val Verde contends that it was prejudiced by the trial court's failure to make the requested findings because, if the court had made the findings, then "it would have been forced to conclude" that the SAB could not include money from the District's general fund in the calculation of the District's "available" money. We do not address this argument because Val Verde did not claim to be prejudiced in its opening brief, and it is not proper for an appellant to raise new points in a reply brief. (*Board of Administration v. Wilson, supra*, 52 Cal.App.4th at p. 1144.)

---

[8] On May 12, 2009, Val Verde moved this court to take judicial notice of documents related to the financial hardship program. We deny Val Verde's motion, because the documents are not relevant to our discussion or disposition of this matter. (*Moran v. Endres* (2006) 135 Cal.App.4th 952, 953, fn. 2 [37 Cal.Rptr.3d 786].)

In regard to the evidentiary rulings, Val Verde fails to explain how the trial court's rulings prejudiced Val Verde. It is not this court's function to serve as Val Verde's backup appellate counsel, and we decline to speculate how Val Verde might have been prejudiced. Accordingly, we deem this contention, to the extent one was raised, to be waived. (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 546 [35 Cal.Rptr.2d 574].)

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal (Gov. Code, § 6103.5).

Hollenhorst, Acting P. J., and Gaut, J., concurred.