Filed 9/29/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ALBERT BATES et al.,<br><br>    Plaintiffs and Appellants,<br><br>       v.<br><br>POWAY UNIFIED SCHOOL DISTRICT,<br><br>    Defendant and Respondent. | G061222<br><br>(Super. Ct. No. 37-2020-00010721-<br> CU-WM-CTL)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge. Reversed and remanded. Requests for judicial notice granted.

Benink & Slavens, Eric J. Benink and Vincent D. Slavens for Plaintiffs and Appellants.

Best Best & Krieger, Tyree K. Dorward and Matthew L. Green for Defendant and Respondent.

In 2014, Poway Unified School District (the District), serving over 36,000 students in San Diego County, constructed a new elementary school. The $82 million project was funded primarily by special tax bonds paid for by homeowners in local communities. Approximately four years later, following the passage of Proposition 51, the District received reimbursement funds from the State of California ($27,672,923). The District allocated a small portion to retire local bonds but used a larger amount toward new high priority outlay expenditures.

Two homeowners, Albert Bates and Bridget E. Denihan, disagreed with the District's fund allocation decision and filed a petition for a writ of mandate and a complaint for declaratory and injunctive relief. The trial court denied all relief and entered a judgment in the District's favor. On appeal, Bates and Denihan (the Homeowners) contend the court misinterpreted the applicable rules and statutes. They read California Code of Regulations, title 2, section 1859.90.5 and Education Code section 17070.63[1] as requiring the District to allocate all newly acquired "State Funds" toward retiring the local bonds, unless it could prove there was a savings during construction (but there was none). We conclude the Homeowners' arguments have merit and we reverse the judgment.

## FACTS

The District is governed by a five-member Board of Education (the Board). The District formed multiple community facilities districts (CFDs) within its boundaries pursuant to the Mello-Roos Community Facilities Act of 1982, codified in Government

---

[1] All further statutory references are to the Education Code, unless otherwise indicated. All further California Code of Regulations references are to title 2 and will be abbreviated to "Reg." For example, California Code of Regulations, title 2, section 1859.90.5 will be referred to as Reg. 1859.90.5.

2

Code section 53311 et seq. (Mello-Roos Act).[2] The Homeowners reside in a community known as 4S Ranch, located within the District's CFD No. 6.

In 2013, the District formalized plans to construct an elementary school it believed would cost $81.5 million (the Project). The District financed the Project relying on special tax bonds funded by numerous CFDs. The Homeowners' CFD contributed $24,980,807.

In 2014, the District applied to the State Allocation Board (SAB) for grant funds through the School Facility Program (SFP) under the Leroy F. Greene School Facilities Act of 1998 (the Greene Act). (§ 17010, et seq.) When the SFP was created two decades earlier, it was fully funded by several voter-approved general obligation bonds. When the District filed its application in 2014, the SFP's funds (also called State Funds) had been depleted. The SAB placed the District's application on an unfunded list, to wait for funds to become available again.

In 2016, voters approved Proposition 51, authorizing the state to sell billions of dollars in general obligation bonds for education purposes, including school facility projects. The SAB began working through a backlog of waitlisted applications. In 2019, it paid the District $27,672,923, which represented its share of the Project's construction costs.

The District held a meeting to determine how these newly acquired State Funds should be utilized because construction on the Project had finished. The District's associate superintendent, Ronald Little, presented a report recommending the State Funds be allocated 45 percent to CFD-related purposes and 55 percent to high priority capital

<hr>

[2]     The Mello-Roos Act authorizes school districts "to form community facilities districts to 'finance the purchase, construction, expansion, improvement, or rehabilitation of any real or other tangible property with an estimated useful life of five years or longer,' as well as related planning and design work. [Citation.] . . . Funding under the act is through the use of special taxes, submitted to a two-thirds voter approval. [Citation.]" (*Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 467.)

projects. The 45 percent for CFD purposes was divided in half with $6,226,407.68 earmarked for retiring local CFD bonds and the same dollar amount going toward CFD high priority capital projects. When another Board member (Kimberly Beatty) questioned Little about this recommendation, he responded the allocation was permitted under the applicable regulations and statutes. He added the District's bond counsel had advised the proposed allocation was legal. The Board voted four to one to adopt Resolution No. 24-2019, which authorized the recommended allocation of the State Funds. Beatty was the single dissenting vote.

The Homeowners filed a verified petition for writ of mandate and a complaint for declaratory and injunctive relief. They challenged the District's failure to allocate State Funds to retire local bonds or toward uses permitted by local bonds. They alleged the following: "Property owners in CFD No. 6 pay thousands of dollars in Mello-Roos special taxes each year. In [f]iscal [y]ear 2019-2020, . . . Bates was assessed $3,534.64 and . . . Denihan was assessed $2,989.66." They argued Reg. 1859.90.5 gave the District only three options for using the SAB's award of State Funds. The first two options allowed the District to use the money toward "retiring local bonds" or "uses permitted by the local bond." (Reg. 1859.90.5 (a) & (b).) They asserted the third option, "high priority capital outlay expenditure[s,]" would only become available if the District could show it achieved "any savings" by "efficient and prudent expenditure[s]" during construction. The Homeowners asserted the District had not achieved any savings, and therefore, its Resolution No. 24-2019 illegally authorized the use of State Funds for capital outlay expenditures.

The Homeowners explained they were seeking a writ of mandate because the District had not yet spent any of the money, and they wanted the court's immediate help in ordering the District to comply with state regulations and statutory authority. They also filed a complaint seeking a judicial declaration stating Resolution No. 24-2019 violated Reg. 1859.90.5 and section 17010.63, as well as an injunction stopping the

4

District from distributing the State Funds for any purpose other than the retirement of local CFD bonds.  The complaint requested attorney fees and costs pursuant to Code of Civil Procedure section 1021.5.

On February 25, 2021, the trial court held a hearing and took the matter under submission.  It denied the Homeowners' requests for relief and issued a lengthy statement of decision explaining the basis for its ruling.  It disagreed with the Homeowners' contention the District needed to show it achieved a savings before expending State Funds on high priority capital projects.

The court made several factual findings.  "When it became clear that the state would sell bonds under Proposition 51, and begin reimbursing school districts based on previously submitted applications, the District began evaluating its options for using any potential reimbursement, including the finances of the Project's design and construction, the facilities needs of the CFDs that contributed to the Project's construction costs, and the requirement of the CFD formational documents and agreements, as well as the overall facilities needs of the District.  [Citation.]  This work also included a full analysis of the complex financing arrangement for the Project, which involved seven total CFDs with various levels of contribution to the Project and allowed the District to calculate the final percentage . . . contribution of each CFD.  [Citation.]  [¶] As the SAB began to implement Proposition 51, and issuance of the State Funds for the Project became likely, the District drafted a summary of its facilities needs and prepared an analysis regarding the feasibility of allocating the reimbursement to support the entire District.  This effort included preparation of a Districtwide facilities master plan that identified more than $1.1 billion in facilities needs across the District.  [Citation.]  The District took into account these Districtwide needs given that all electors of the District were asked to support, and ultimately contributed to, the passage of the statewide vote on Proposition 51.  [Citation.]  The District therefore determined that all students and parents across the District deserved to benefit from the SFP reimbursement, which the

5

District only obtained through passage of Proposition 51. [Citation.] The District reasoned that to do otherwise would be unfair to non-CFD students and would result in the Districtwide voters located outside of the CFDs potentially seeing no benefit from their votes in support of Proposition 51. [Citation.]"

The statement of decision further provided: "In 2018, the SAB ultimately awarded the District a grant in the amount of $27,672,923 (the 'State Funds'). [Citation.] To determine how best to allocate the State Funds fairly and equitably across the District, the District analyzed student data to determine the percentage of students in the CFDs versus non-CFD students and what schools they attend. [Citation.] The District also looked at the registered voters of the District, again focusing on CFD voters versus non-CFD voters. [Citation.] The District determined that these data points dictated that if the State Funds were to be equitably allocated, the reimbursed funds should be split on a 45 [percent]/55[percent] basis between the CFD reimbursements versus the other high-priority facilities projects across the District. [Citation.] From this allocation, the remaining data was used to divide the 45[percent] allocated to the CFDs consistent with each CFD's percentage contribution to the original Project funding, as well making funding available for future high priority projects at schools in the CFDs showing future growth. [Citation.] [¶] Based on the foregoing, the District's Board . . . adopted Resolution No. 24-2019 (the 'Resolution') on March 14, 2019, which allocated . . . approximately $21.4 million of the State Funds to fund 'high-priority capital projects' on a Districtwide basis. [Citation.]"

In addition, the court stated it took judicial notice of legislative history materials and several other documents provided by the parties. It noted the parties stipulated the matter would be decided without a formal administrative record, and that instead the parties would present evidence. The court commented that the stipulation provided all documents were self-authenticating and admissible as if they had been certified in an administrative record. It observed the relevant facts were undisputed.

6

After discussing the general rules regarding statutory interpretation, the court explained the parties offered two distinct interpretations of Reg. 1859.90.5, and therefore, the language was ambiguous. The court concluded it must look to extrinsic sources to interpret the regulation. It reasoned the legislative history, the SAB's interpretation of the regulation, public policy, and the statutory scheme all supported the District's interpretation of Reg. 1859.90.5.

The court stated the legislative intent regarding Reg. 1859.90.5 was clearly reflected in a report prepared by an executive officer in connection with a 2004 SAB meeting. According to the report, the SAB was concerned school districts would use State Funds for general fund purposes, such as teacher salaries or operating expenses, rather than school construction projects. The court noted the report did not mention a savings was required before the District could use the State Funds for high priority capital projects.

The court next considered correspondence between the District and an audit supervisor (Jason Hernandez) working for the SAB. Hernandez wrote the SFP regulation section in question stated reimbursement funds can be used for high priority capital outlay needs "just like savings from a non-financial hardship SFP project can be used for those purposes." The court stated that although Hernandez's interpretation was not dispositive, it was "entitled to deference" from the court.

The court also considered the statutory scheme and public policy. It determined voters passed Proposition 51 to provide $3 billion for new construction. Proposition 51 did not impose a savings requirement before the money could be used for new construction. Moreover, there was nothing to suggest the voters intended the money to only be used to retire debt from already-completed projects. "If the $3 billion in Proposition 51 funds could only be used to retire debt except in rare cases where a savings is calculated after a project is completed, then the passage of a state bond would provide no benefit to anyone in the state who lives outside of a CFD. That cannot be the

intent of Proposition 51, and no such intent is reflected in Proposition 51. Here, it is uncontroverted that the District undertook extensive due diligence prior to allocating the State Funds and made sure that the entire District benefited from Proposition 51 funds in a fair and equitable manner. Approximately forty-five percent . . . of the District is located within CFD areas, and roughly fifty-five percent . . . of the District is located outside CFD areas. The District used this same ratio to allocate the State Funds to CFD and non-CFD areas within its boundaries. Ignoring the intent of Proposition 51, and forcing the District to allocate the reimbursed funds from Proposition 51 solely to the CFD areas, would violate public policy."

The court added, "[W]hen the original SFP regulations were adopted, and the SAB funding application and apportionment process was formulated, SFP funding was intended to be available during construction. [Citation.] The SFP program was intended to fund 50 [percent] of the construction cost of a project, and the local school district could obtain its funding as soon as it had the project under contract for construction. [Citations.] For ongoing construction projects approved for funding during construction, it therefore may have been possible for a school district to achieve a savings through efficient and economical construction management on a particular project by receiving an apportionment and then working to complete construction for less than the original estimated construction cost. However, given that SFP funding is now only obtained as a reimbursement after construction is fully completed, and at a time where all construction costs are fixed, a savings circumstance after the fact is practically impossible."

DISCUSSION

The parties do not dispute any material facts. The Homeowners only challenge the trial court's interpretation of Reg. 1859.90.5 and section 17070.63. They maintain these provisions unambiguously imposed a savings requirement, and in any event, extrinsic evidence supports their statutory interpretation. We agree.

8

I. *Standards for Interpreting Statutes and Administrative Regulations*

"'As a starting point, the interpretation of an administrative regulation is subject to the same principles as the interpretation of a statute. [Citation.]' [Citation.] ""When interpreting a statute our primary task is to determine the Legislature's intent. [Citation.] In doing so we turn first to the statutory language, since the words the Legislature chose are the best indicators of its intent.' [Citations.] . . . '"If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) . . . ."'" [Citation.] However, the literal meaning of a statute must be in accord with its purpose as our Supreme Court noted in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 658-659, as follows: 'We are not prohibited "from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the [statute] . . . ."' . . . Further, the Supreme Court has held: 'We have recognized that a wide variety of factors may illuminate the legislative design, "'such as context, the object in view, the evils to be remedied, the history of the time and of legislation upon the same subject, public policy and contemporaneous construction.'" [Citations.]' [Citation.]" [Citation.]' [Citations.]" (*Sanchez v. State of California* (2009) 179 Cal.App.4th 467, 477-478 (*Sanchez*).)

"Our interpretation of a statute is typically subject to de novo review. [Citation.] Despite the similarities between interpreting statutes and regulations, an important difference between the interpretation of a statute and the interpretation of a regulation is that 'we defer to an agency's interpretation of a regulation involving its area of expertise, "'unless the interpretation flies in the face of the clear language and purpose

9

of the . . . provision.' [Citation.]" [Citation.]' [Citation.]" (*Sanchez, supra,* 179 Cal.App.4th at p. 478.)

II. *Legal Background*

A. *The Education Code*

Before jumping into statutory interpretation, it is helpful to first understand the interplay between the relevant statutory and regulatory schemes. California's Education Code has a section devoted to "School Bonds." Within Part 10, there are several chapters outlining the rules for, and state agencies created to implement, numerous school-bond related legislative schemes. Relevant to this case, Chapter 12.5 discusses the Greene Act, which was created to "govern the allocation of State Funds for school facilities construction." (*California Charter School Assn. v. Los Angeles Unified School Dist.* (2015) 60 Cal.4th 1221, 1230 (*California Charter School*).) "It encompasses sections 17070.10 through 17078.[30] and provides a framework for state and local funding to build local school facilities. (See, e.g., §§ 17071.75 [eligibility for funding]; 17072.30 [requirement of local participation]; 17079.10 [state funding to relieve overcrowding].) A comprehensive description of the Greene Act is not necessary to this opinion, and we will focus on the provisions and applications relevant to the contentions on appeal." (*San Bernardino City Unified School Dist. v. State Allocation Board* (2022) 79 Cal.App.5th 12, 15 (*San Bernardino City Unified*).)

The Greene Act created a complex matrix of rules for the management and distribution of the State School Facilities Fund, also referred to as the School Facility Program (SFP). "The general provisions of the Greene Act are set forth in article 1. Under that article, the [SAB] is granted authority to adopt regulations for administering the Greene Act, to determine local districts' eligibility for funds under the Greene Act, and to apportion those funds. (§§ 17070.30; 17070.35, subd. (a).)" (*San Bernardino City Unified, supra,* 79 Cal.App.5th at p. 15.) The SAB administers the SFP with assistance

10

from the Office of Public School Construction (OPSC), which is an arm of the California Department of General Services. (§§ 17070.30, 17070.40; Reg. 1859.2.)

Article 4, "New Construction Grant Eligibility Determination," explains how the SAB calculates the maximum amount available for new construction grants. The formula involves "multiplying the number of unhoused pupils calculated pursuant to Article 3 . . . in each school district with an approved application for new construction . . . ." (§ 17072.10.)

Article 5 describes the "New Construction Funding Process." It involves a complicated system for ranking approved applications, which requires consideration of multiple factors resulting in the award of priority points. (§ 17072.25.) In addition, a school district must promise it will be able to match the requested funds dollar for dollar. "Subject to the availability of funds, and to the determination of priority . . . the [SAB] shall apportion funds to an eligible school district" only after "certification by the school district that the required 50 percent matching funds from local sources have been expended by the district for the project, or have been deposited in the county fund, or will be expended by the district by the time the project is completed, in an amount at least equal to the proposed apportionment . . . prior to release of the [S]tate [F]unds." (§ 17072.30; Reg. 1859.77.1.) "In other words, 50 percent of school construction money typically comes from local sources, and the other 50 percent is derived from the State[]." (*Sanchez, supra,* 179 Cal.App.4th at p. 474.)

Article 5 also outlines in section 17072.35 strict limitations on "use of new construction grant funds." The money may be used for "any and all costs necessary to adequately house new pupils in any approved project . . . ." (*Ibid.*) The statute specifies "those costs may only include" specific expenditures listed in the legislation. The detailed list includes costs for everything from engineering to the installation of portable classrooms. Article 6, regarding modernization projects, imposes similar use restrictions.

11

(See § 17074.25; Reg. 1859.79.2 [funding limited to expenditures "on the specific site where the modernization grant eligibility was generated"].)

The statutory scheme contains one exception to these use restrictions. Section 17070.63 has the title, "state's full and final contribution." It provides the "total funding provided under this chapter shall constitute" the entire amount of State Funds for the facilities project. "As a condition of receipt of funds, a school district shall certify that the grant amount, combined with local funds, shall be sufficient to complete the school construction project for which the grant is intended." (§ 17070.63, subd. (a).) The last subdivision of this statute added an incentive for school districts needing funding for other projects: "'Any savings achieved by the district's efficient and prudent expenditure of these funds shall be retained by the district in the county fund for expenditure by the district for other high priority capital outlay purposes.'" Like other courts, we will refer to this provision as the "general savings statute." (*San Bernardino City Unified, supra,* 79 Cal.App.5th at p. 15.)

To summarize, if the SFP is fully funded, the SAB can award State Funds to school districts, based on the number of unhoused pupils, to share in the cost of new construction projects. In return, school districts must (1) file an application satisfying certain eligibility requirements, (2) certify it has raised matching funds from local sources, (3) certify the combination of state and local funds will suffice to fully complete the project, and (4) promise not to spend the money on other projects unless the school district can demonstrate a savings earned due to efficient and prudent expenditures in building the project.

B. *The Regulations*

Because the SFP's funding was dependent on voter-authorized bond sales, there were periods when the SFP was depleted. Under its authority to draft regulations to implement the Greene Act, the SAB created new rules regarding the management and prioritization of unfunded but eligible applications placed on a waiting list. The SAB

12

called the list "Applications Received Beyond Bond Authority List" (the Waiting List). (Reg. 1859.95.1.)

For example, the SAB determined school districts that wanted their applications to remain on the Waiting List, and continue to be eligible for the future payment of State Funds, must submit a resolution acknowledging the following: (1) the SFP "bond authority is currently exhausted for the funds being requested[;]" (2) the state is "not expected" nor obligated to provide funding for the project; (3) future bond measures for the SFP may not provide funds for the application submitted; and (4) "any pre-construction or construction activities" will be "at the District's discretion" and will not be the responsibility of the State of California. (Reg. 1859.95.1 ["Applications Received When Bond Authority Is Unavailable"].)[3]

Because the money requested by older applications could not be distributed contemporaneously with new construction, the SAB determined it would *reimburse* certain school districts for eligible completed projects when money became available in the SFP. In 2004, the SAB determined it was necessary to draft a regulation controlling the use of reimbursement funds. The SAB drafted a regulation to guarantee that school districts would use the grant money as intended under the Greene Act, even though the approved Project was already completed. To clarify the appropriate use of state funding post-construction, the SAB promulgated Reg. 1859.90.5.

Reg. 1859.90.5 provides the following: "When a school district uses local bond funds to make eligible project expenditures authorized in the Leroy F. Greene Act and state school bond funds are made available to reimburse the state's share of those eligible project expenditures, the reimbursement funds shall be used as follows:

"(a) Toward retiring the local bonds; and/or

"(b) Toward uses permitted by the local bond, or

---

3 We have only included the acknowledgements relevant to this appeal.

"(c) For any high priority capital outlay expenditure in the district as permitted in . . . [s]ection 17070.63[, subdivision] (c) [the Article 1 general savings statute].

"The use of the reimbursement funds in accordance with this section shall be subject to oversight by the applicable county office of education pursuant to [s]ection 1240." (Reg. 1859.90.5.)

Many years later, in 2016, voters approved Proposition 51, which once again replenished the SFP. The SAB allocated money to many school districts on the Waiting List to pay for completed projects. There is no dispute those school districts were required to comply with Reg. 1859.90.5's limits on how to use Greene Act funding.

III. *Analysis*

A. *Unambiguous Regulation*

The District asserts, and the trial court determined, Reg. 1859.90.5 was ambiguous simply because the parties disagreed about how to interpret subdivision (c). This is not the test. "'[S]tatutory ambiguity cannot be determined by referring to the parties' interpretations of the statute. Of course their interpretations differ. That is why they are in court.' [Citations.]" (*Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 597.) "A statute is ambiguous when it is susceptible to more than one reasonable interpretation." (*Spotlight on Coastal Corruption v. Kinsey* (2020) 57 Cal.App.5th 874, 891.) As will be described in more detail below, we conclude the regulation's language is clear and unambiguous. We agree with the Homeowners' interpretation of the statute, and conclude the District's interpretation was unreasonable.

The first paragraph of Reg. 1859.90.5 plainly explains there are four requirements to qualify for reimbursement funding on a completed project. First, there must be State Funds "made available to reimburse" Greene Act eligible projects. (Reg. 1859.90.5.) Second, the school district must have made Greene Act eligible project

14

expenditures. Third, there must be evidence of the "state's share of those eligible project[s]," which the statute set at 50 percent of the required funding. (§ 17072.30.) Fourth, the school district must have made expenditures for eligible projects using local bond funds because the State Funds were unavailable.

The nature of these restrictions clearly reflects an intention to limit the allocation of reimbursement funds. The regulation was specifically designed to financially assist only school districts that turned to local bonds when the SFP was unfunded. Indeed, the SAB forewarned school districts there should be no expectations about the receipt of state funding. (Reg. 1859.95.1.)

The second part of Reg. 1859.90.5 provides school districts with three options for using reimbursement funding. The list is mandatory, directing the District "shall" be limited in how it uses the funds. This directive reconfirms the opening paragraph's stated purpose of assisting school districts forced to use local bonds for an entire construction project. Indeed, subdivisions (a) and (b) of Reg. 1859.90.5, explicitly require school districts to use the newly acquired funding to alleviate the financial burden imposed on those communities when the state lacked funding to pay its share. The SAB envisioned school districts would use the funds to "retir[e] local bonds" or pay for related local bond expenditures. (Reg. 1859.90.5, subds. (a), (b).)

The third spending option listed in Reg. 1859.90.5 does not relate to local bonds. Subdivision (c) of the regulation provides reimbursement funds are available "[f]or any high priority capital outlay expenditure in the district *as permitted in . . .* [s]ection 17070.63[, subdivision] (c) [the Greene Act's general savings statute]." (Italics added.) The language "as permitted in" is commonly understood as creating a condition to payment. And the parties do not dispute the Legislature enacted section 17070.63, subdivision (c), to authorize an expenditure *exception* to the Greene Act's strict rules regarding use of State Funds.

15

In the Greene Act, the Legislature included this statutory exception to reward school districts by allowing them to retain any savings achieved during construction toward any future high priority capital outlay expenditures. (§ 17070.63, subd. (c).) Only school districts that reported a savings after completing the approved Project could retain those State Funds for other construction projects. The SAB appears to have included this same type of expenditure when drafting Reg. 1859.90.5, equitably treating school districts receiving SFP funding before construction the same as those receiving reimbursement funds. The agency fairly recognized districts should benefit from the same construction savings incentive regardless of when the approved project was completed. The SAB intended the conditional nature of the payment to remain the same because it incorporated the entire statutory exception (§ 17070.63, subd. (c)) without modification. The regulation plainly allows school districts to spend any savings earned on new capital expenditures as permitted in section 17070.63.

To briefly summarize, we interpret the clear and unambiguous language of the regulation as limiting a school district's use of reimbursement funds. The three expenditure options are not equally available. The first two options regarding local bonds have no restrictions or preconditions. However, the third type of expenditure will not always be obtainable. The Homeowners correctly interpret the language "as permitted in" as designating a restricted exception to the mandated use of State Funds.

Further support for this distinction is the punctuation and transitional words separating the three options. "'[W]hile not of controlling importance, punctuation is part of a statute and should be considered in its interpretation . . . .' [Citation.] Punctuation by a semicolon 'is indicative of a complete thought in one clause separate from the other clauses of the statute.' [Citation.] Additionally, the plain and ordinary meaning of the word 'or,' when used in a statute, is to designate separate, disjunctive categories. [Citation.] The word 'or' suggests alternatives. [Citation.] In its ordinary sense in a statute, ""the function of the word "or" is to mark an alternative such as "either this or

16

that."'"' [Citation.]" (*In re E.A.* (2018) 24 Cal.App.5th 648, 661 (*E.A.*).) "The ordinary and usual usage of 'and' is as a conjunctive, meaning '"an additional thing,"' 'also' or 'plus.' [Citations.]" (*In re C.H.* (2011) 53 Cal.4th 94, 101-102.) "The term 'and/or' is commonly defined to mean either 'and' or 'or.' [Citations.]" (*Powers Farms, Inc., v. Consolidated Irr. Dist.* (1941) 19 Cal.2d 123, 128.)

Looking at Reg. 1859.90.5, the first item on the list (the option to retire local bonds), is followed by a semicolon and the term "and/or". This signifies it is a complete thought and the District could select the first option as an alternative or in addition to the next items on the list.

The last two items on the list are separated by a comma, not a semicolon. This change in punctuation signals that the second and third options do not represent complete thoughts. SAB's addition of the word "or" between the second and third options, rather than reusing the term "and/or"[,] supports the interpretation these options were alternatives offered to the school district should the first option be unavailable.

In other words, if it happened that local bonds were retired before the SFP received funding (eliminating the subdivision (a) of Reg. 1859.90.5 option), the District would have the alternative options to *either* use retirement funds "toward uses permitted by the local bond, *or* [f]or any high priority capital outlay expenditure in the district as permitted in" the statutory savings clause. (Reg. 1859.90.5, subds. (b), (c).) The function of the word "or" is to offer either this or that. (*E.A., supra,* 24 Cal.App.5th at p. 661.) If the SAB had intended the District to select both options two and three, it would have used the words "and" or "and/or" instead of simply "or." Thus, if the District failed to realize any savings during construction, it was required to use all of the state's money toward uses permitted by the local bond or completely retire the local bonds funding the project.

Our interpretation is also confirmed by comparing the literal meaning of the regulation to the Greene Act's statutory purpose and other provisions in the statute.

17

(*Sanchez, supra,* 179 Cal.App.4th at p. 477 ["'each sentence must be read not in isolation but in light of the statutory scheme'"].) Subdivision (c) of Reg. 1859.90.5 broadly permits the District to use reimbursement funds for "*any* high priority capital outlay expenditure in the district . . . ." (Reg. 1859.90.5, subd. (c), italics added.) "'Any' is a term of broad inclusion, meaning 'without limit and no matter what kind.' [Citation.]" (*Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 635.) The use of this all-embracing term is important in our statutory analysis because a regulation permitting "any" capital expenditure is a significant departure from the Greene Act's strict statutory rules limiting the use of funding for expenditures on the approved new construction project or the specific site where modernization eligibility was generated. (§§ 17072.35, 17074.25.) "Where a statute empowers an administrative agency to adopt regulations, such regulations 'must be consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose.' [Citations.]" (*Woods v. Superior Court* (1981) 28 Cal.3d 668, 679; *Gregory v. State Bd. of Control* (1999) 73 Cal.App.4th 584, 594.) Courts must strike down as void regulations that "alter or amend the statute or enlarge or impair its scope." (*Morris v. Williams* (1967) 67 Cal.2d 733, 748.)

What saves subdivision (c) of Reg. 1859.90.5 from being struck down is that the Greene Act authorizes a similar type of expenditure, but it is a conditional exception to the strict rules regarding the use of construction grant funds. (§ 17070.63, subd. (c) [general savings statute].) Thus, to remain consistent and not in conflict with the Greene Act's general savings statute, the SAB wisely incorporated the entire statutory provision, thus creating the same use prerequisite in the regulatory scheme. A regulation cannot enlarge or alter the scope of permitted expenditures under the Greene Act.

We reject the District's assertion the "as permitted in" language was included in a comparative manner to section 17070.63, subdivision (c), to either "underscore" the limits of what reimbursement funds can be used for or "to incorporate accounting features." To accept this argument, we would have to add comparative rather

18

than conditional words into the statute. "'This court is loathe to construe a statute which has the effect of "adding" or "subtracting" language. [Citation.]' [Citation.]" (*General Development Co., L.P. v. City of Santa Maria* (2012) 202 Cal.App.4th 1391, 1395.) If it was the SAB's intention to merely compare or incorporate accounting terminology it could have easily—and more clearly—done so.

We can discern no meaning of the phrase "as permitted in" other than its commonly understood meaning. The word "permitted" is commonly understood to mean "to consent to expressly or formally," "to give leave," "make possible," or allow. (https://www.merriam-webster.com/dictionary/permitted.) The addition of the word "as" used in conjunction with another word is commonly understood to mean "in or to the same degree" or "in the way or manner" of something. (https://www.merriam-webster.com/dictionary/as.) Thus, use of the phrase "as permitted in" before a particular statute is commonly understood as a simple acknowledgement the regulation incorporated something "to the same degree" or manner that was allowed in the statute. We interpret "as permitted in" as evidence the SAB incorporated into the regulation the exact same savings requirement imposed by the Greene Act.

There are several more reasons why we conclude the District's interpretation of Reg. 1859.90.5, subdivision (c), is unreasonable. Essentially, the District is advocating for three equally unencumbered options to use reimbursement funding. However, the primary basis for the District's argument is not the application of any well-established rules of statutory interpretation. Instead, the District maintains the SAB did not intend to add a "savings" prerequisite because it was nearly impossible to calculate any savings in a reimbursement setting. But the remote possibility of a "savings" is factual determination, not a legal conclusion about the meaning of the regulation or Legislative intent. The District has confused surplusage with inapplicability. Simply because a statutory provision will not apply in all instances does not mean it should be ignored.

19

Moreover, the District's interpretation is unreasonable because it ignores that all grants under the Greene Act are calculated using a formula unrelated to actual construction costs. A school district's ability to save money during construction can be achieved based on efficiency factors independent from whether it receives assistance from the state before or after construction has completed. And finally, as will be discussed in more detail anon, there was evidence a savings, although difficult, was possible.

B. *Extrinsic Evidence of Legislative Intent*

The District's briefing is premised on the faulty conclusion the regulation's language was ambiguous, and it assumes this court must therefore examine extrinsic evidence for judicial construction. As discussed, the District made an incorrect assumption. Nevertheless, we will review the extrinsic evidence because the lack of ambiguity and plain meaning rule does not prevent us "from determining whether the literal meaning of the statute comports with its purpose. [Citations.]" (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1083.) "Thus, although the words used by the Legislature are the most useful guide to its intent, we do not view the language of the statute in isolation. [Citation.] Rather, we construe the words of the statute in context, keeping in mind the statutory purpose. [Citation.]" (*Ibid.*) As will be explained below, some of the extrinsic evidence discussed by the parties does not shed any light on the SAB's intention when promulgating Reg. 1859.90.5, but the evidence that does reflect statutory purpose further supports our "literal meaning" interpretation.[4] (*Ibid.*)

---

[4] We grant the Homeowners' request that this court take judicial notice of documents considered by the trial court and included in our record. We also grant their request to take judicial notice of legislative history consisting of several pages of the California Regulatory Notice Register 1998, No. 49 regarding the Greene Act. (Evid. Code, §§ 452, subd. (c), 459, subd. (a).) We also grant the District's request for judicial notice of documents considered by the trial court and a 2019 California School Accounting Manual. (*Ibid.*)

i. *Advisory Opinions from OPSC*

The District asserts e-mails written by an OPSC audit supervisor confirm it was not required to establish "a savings" during construction before spending grant funds on other priority capital projects. We conclude this evidence is not relevant to the question of statutory intent.

As discussed earlier in this opinion, the general provisions of the Greene Act explain the SAB administers the SFP with assistance from the OPSC, which is part of the Department of General Services. After the District passed Resolution No 24-2019, the District's planning department's assistant director asked the OPSC for help understanding Reg. 1859.90.5. She wrote an e-mail stating, "I have someone questioning my rationale in relation to the 'savings' piece mentioned [in section 17070.63, subdivision (c)] and how that relates to reimbursement funds usage."

An OPSC program analyst replied via e-mail, "Generally speaking, school districts that do not receive financial hardship assistance may retain project savings achieved by utilizing cost-saving measures and efficient project management." The analyst explained, "Once the savings have been expended on the other high priority capital facility need . . . this must be reported to OPSC [under Reg. 1859.103 and section 17076.10, subd. (a) and] the school district must continue to submit expenditure reports annually until all of the project funds . . . have been expended." She noted, "I'm not as familiar with the expenditure reporting aspect, but if you would like, I can connect you to a member of our audit team for further guidance."

The assistant director sought further clarification from the OPSC analyst, asking, "[S]ince districts are now receiving reimbursements for their projects; if we had no 'savings' in particular does this mean we cannot use the reimbursement [for] other high priority capital outlay projects and only have the option to pay the debt of the local bond or used the reimbursement as intended by the bond?" The OPSC analyst replied, "Yes," but added that she would forward the message to a member of the audit team.

21

Jason Hernandez, the audit supervisor with the OPSC, sent an e-mail that advised the District had several options on how to use funding for a reimbursable project. He stated, "The first is usually they can reimburse the fund that was originally used to make the project expenditures. If it is not necessary to reimburse the original fund, then the district has a few options. If the district used local bond funds to make the eligible project expenditures, then per [Reg. 1859.90.5] the reimbursement funds can be used on the following if it was not needed to reimburse the original fund: 1. They can be used toward [] retiring the local bond [¶] 2. Toward uses permitted by the local bond, or [¶] 3. For any high priority capital outlay expenditure of the district. [¶] If the district used other funding source[s] besides local bond funds, they can also use the funds on high priority capital outlay needs of the district if it was not first needed to reimburse the original fund of the eligible project expenditures."

In response to this explanation, the assistant director explained her concerns: "Can I follow up on this because I am getting hammered by a small piece of the regulation; [Reg. 1859.90.5, subdivision (c)]. We don't have a requirement to meet (a) or (b); when presenting (c) I keep getting push back because the reg says, '. . . as permitted in . . . section 17070.63[, subdivision (c)] . . . . This piece to a non-participant of the SFP seems to say we can only use [Reg.] 1859.90.5,[ subdivision (c)] if the project had savings. [¶] My interpretation is that if we had savings this would apply but in the sense there are no savings the reimbursement can be used directly on high priority capital outlay expenditures. [¶] Does that make sense?"

Hernandez's next e-mail repeated what was disclosed in his prior e-mail. He stated the following: "SFP [Reg. 1859.90.5] is stating how reimbursement funds can be used once State [F]unds are made available. The regulation section is not discussing how SFP project savings can be used. [Reg. 1859.90.5, subdivision (c)] refers to . . . section 17070.63[, subdivision (c)] because it is stating that an acceptable use of the reimbursement funding from the state is to use it for any high priority capital outlay need

22

of the district. The Education Code is the original section of the law that allows for non-financial hardship savings to be used on expenditures for high priority capital outlay needs. [¶] The [regulation] in question . . . is stating that reimbursement funds can be used for high priority capital outlay needs of the district just like saving from a non-financial hardship SFP project can be used for those purposes."

We fail to see how Hernandez's opinion helps the District. Neither of his responses directly answered the District's question about whether a savings was required. His second e-mail highlighted how the statute and regulation differed because the former discussed the *use* of project savings and the latter addressed the *use* of reimbursement funds. He added the regulation allowed *the State Funds to be used* for high priority expenditures "just like" the general savings statute. We read both e-mails as being focused on theoretical possible "uses."

Hernandez's statements should not be given any more or less weight than the opinions offered by the OPSC program analyst, who directly answered the District's question. She stated that when there are no project savings, the District was limited to using the reimbursement funds toward local bond uses or paying off the debt. The District argues her opinion should be discounted because she stated the District's inquiry was outside her area of expertise. Not so. She did not indicate the question was entirely beyond her scope of knowledge. Rather, she told the District she would refer the matter to a member of the audit team because she was "not as familiar with the expenditure reporting aspect" of the District's question. A lack of expertise on how to report expenditures to the SAB should not be construed as a lack of understanding of the regulation's requirements and restrictions.

In any event, we are unconvinced the opinions offered by either OPSC employee was relevant to our consideration of the SAB's intent in drafting the regulation or the purpose of that regulation. "Generally, we defer to an agency's interpretation of its own procedures. [Citations.] One 'reason we give weight to the agency interpretation of

23

its own policies and procedures is because the agency has developed a level of "expertise" in light of its familiarity with the legal and regulatory issues.' [Citation.]" (*Teacher v. California Western School of Law* (2022) 77 Cal.App.5th 111, 130.)

However, in this case we have no reason to treat informal correspondence between the District and OPAC employees as being the same as SAB's official position on a statutory construction issue. Neither of these employees claimed to have any expertise with respect to legal or regulatory issues, nor did they suggest the SAB previously interpreted the regulation in any particular way. Accordingly, neither the auditor's nor the analyst's interpretations "merit[] any measure of presumptive deference." (*McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 245, [refusing to give deference to communications between Department of Insurance personnel to insurers regarding construction of insurance code sections].)

ii. *The 2004 SAB Executive Officer Report (EO Report)*

The District explains the EO Report was prepared for a 2004 SAB meeting, at which the SAB agreed to enact the regulation in question. It maintains the report proves the SAB was *only concerned* about school districts misusing state bond funds for operating expenses, not capital expenditures. We disagree.

The first line of the EO Report, explains the meeting was called to request adoption of proposed legislation "that clarifies appropriate uses of state bond funds *used to reimburse local funding.*" (Italics added.) This sentence clearly reflects SAB's intention that school districts use the grant money to reimburse the original source of funding. This contradicts the District's claim the funding was unencumbered.

The next section of the SAB's report provided the following background information: "Concerns have been expressed over a school district placing funds received from the [SAB] directly into the District's General fund *without reimbursing* its Capital Project Fund when that was the original source of funding for the project expenditure. In response to the concern, the SAB directed the [OPSC] to request an

24

opinion from the Attorney General (AG) regarding this issue. As a part of that specific question, the AG was asked to consider the position by the OPSC/SAB that reimbursement of eligible project expenditures satisfies all legal requirements pertaining to the use of state bond funds." This part of the report does not support the District's claim the SAB was *only concerned* about school districts depositing State Funds into its general fund. The SAB stated it was also concerned school districts would use the money *without reimbursing* the original source of funding/local bonds.

The EO Report discussed the AG's response to the SAB's questions. The report stated the AG opined the OPSC/SAB "positions met the requirements of state law but indicated concern that the transfer of state bond money directly into a district's General Fund, when the project costs were initially funded by local bond funds, *could violate the intent of the local and state bond funds*." (Italics added.) The AG recommended the current regulations should be amended to clarify oversight and accounting responsibilities of various parties, and the OPSC should ask a tax attorney for advice to "ensure that the tax-exempt status of the state's SFP bonds is not jeopardized." The report explained the OPSC hired "independent tax counsel" to help formulate new regulations to address these issues. The report concluded, "The new regulation will clarify how state bond funds are to be used *in reimbursement of the state's share on locally funded projects* and provide that all reimbursement transactions of this nature shall be subject to oversight by the applicable County Office of Education." (Italics added.)

This section of the report is directly relevant to our evaluation of the regulation's purpose. SAB promulgated the regulation to clarify how grant funds can be used in reimbursement *on locally funded projects*. The SAB stated its goal was to make sure school districts could not misuse "state bond funds used to reimburse local funding." The agency understood it needed this new regulation to address several different concerns, including how to best safeguard "the intent of the local and state bond funds."

25

Contrary to the District's contention, this report does not clarify whether SAB imposed a savings requirement into subdivision (c) of Reg. 1859.90.5. The report did not mention any specific part of the proposed regulation or suggest any preference for new capital outlay expenditures. We found nothing in the report to support the District's theory the SAB intended Reg. 1859.90.5 to confer unfettered access to grant money for any future priority outlay expenditures. To the contrary, the only suggested preferences stated in the report was to make sure the money was used to "*reimburse local funding,*" avoid "violat[ing] the intent of the local and state bond funds," and "ensure" the bonds maintained a certain tax-exemption status. (Italics added.)

In the briefing, both parties attempt to explain how the regulation maintained the tax-exempt status of the state bond funds by prohibiting school districts from using grant money for general operating expenses. While informative, we conclude this statutory analysis has limited relevance to the question at hand. One does not need to delve into the United States Treasury Regulations to appreciate the Greene Act statutorily defined limitations on the type of expenditures allowed by voter-approved bonds funding the SFP. No one disputes the money could not be used for general operating expenses.

iii. *Proposition 51*

The District asserts the court properly considered Proposition 51 when interpreting the regulation. It proceeds to explain the purpose of this voter initiative, claiming it was intended to fund capital facilities projects regardless of whether a savings was achieved on a prior project. Noticeably missing from its argument is any legal analysis to support its theory a 2016 voter-approved bond initiative can supply insight into the statutory purpose of the Greene Act (enacted 1998) or a regulation (enacted in 2004). We conclude this extrinsic evidence is not relevant to the issue at hand, i.e., our statutory interpretation of Reg. 1859.90.5.

For the past few decades, numerous voter-approved bond sales have served as the source of Greene Act funding. None of these initiatives modified the Greene Act's provisions. The parties did not present evidence indicating Proposition 51 amended the Greene Act's general savings statute or rules limiting expenditures. If the creators of this initiative wished to make sure specific bond funds were available for new capital expenditures, beyond those mandated by the Greene Act, they needed to have explicitly stated so in the proposed legislation.

We found no authority, and the District cites to none, holding the voters presumed intent regarding Proposition 51 should supersede unambiguous statutory provisions expressly placing limits on capital project expenditures. To the contrary, we conclude a different presumption applies to measures approved by the initiative process. We must presume voters in adopting an initiative, like the Legislature drafting new laws, "did so being 'aware of existing laws at the time the initiative was enacted.' [Citations.]" (*People v. Valencia* (2017) 3 Cal.5th 347, 369.) Accordingly, it is presumed Proposition 51 did nothing to alter the Greene Act's express restrictions on expenditures beyond the approved Project, and voters were aware of the limited exception to this rule applied only in cases where the District achieved a savings. Proposition 51 cannot help us in determining the statutory purpose of the Greene Act and its supporting regulations.

C. *Practical Considerations*

The parties dispute whether a savings is achievable. Essentially, the District asserts the realities of construction costs render Reg. 1859.90.5, subdivision (c), worthless, and therefore our interpretation of the regulation is unreasonable. The District notes the trial court observed it was a "very rare case where a project comes in under budget." and therefore reimbursement funds should be used for any other capital projects regardless of any savings.

Certainly, we would question the purpose and validity of a regulation (and statute) requiring a savings if this was impossible to achieve. However, the Homeowners

27

presented an audit report reflecting that as of November 30, 2020, there were two schools able to report savings to the SAB. The District did not present evidence to dispute this fact. In any event, we cannot say realizing "a savings" during construction was an impossible goal.

We also find relevant the Homeowners' evidence the OPSC and SAB created publications demonstrating "savings" was a key feature of the Greene Act. Section 17070.33 authorized the SAB to adopt guidelines "to achieve measurable reductions in the costs of school facilities construction." The SAB published the "Public School Construction Cost Reduction Guidelines" with the stated intent of "setting forth the best practices and strategies for construction or new, or modernization of existing, facilities." It advised that the current funding mechanism's "key element is the grant approach and the ability for the school districts to retain the 'savings' as incentive for cost efficiency in design and construction." It explained, "The prior system can be characterized as a 'bottom up' approach where a construction project was funded by adding up all of the elements of the project and arriving at a total state loan amount based on allowances for each element. In contrast, the [Greene Act] approach is 'top down'. The total state amount is a grant based on student eligibility. In the old system, the incentive was to build as much as allowed because the District got more money. In the new system the incentive is to be as cost-effective as possible because the District gets a fixed amount regardless of the project, and it can use its savings on another project."

In addition, the OPSC published a School Facility Program Handbook in 2019, which noted the SAB developed cost reduction guidelines. The Handbook stated, "Along with cost reduction guidelines, other incentives within the program, such as the retention of savings for projects not requesting financial hardship assistances, exist to promote efficiency in the design and construction of school facility projects." These two publications both acknowledge the savings requirement, and encourage the districts to reach for the reward of using saved funds for other capital needs.

28

In summary, we conclude the extrinsic evidence confirms the primary purpose of the Greene Act was to fund approved construction projects, not just any capital expenditure desired by school districts. Encouraging the districts to save money during construction was a secondary goal. Our literal construction of Reg. 1859.90.5 can easily be harmonized with the Legislative purpose of the Greene Act's statutory provisions and the SAB's supporting regulations.

III. *Concluding Thoughts*

As a practical matter, if the SFP was fully funded when the District filed its application in 2014, the SAB would have awarded funding based on its formula of taking into account the number of unhoused pupils. The amount calculated would have been released to the District as soon as the state received the District certification "that the grant amount, combined with local funds, shall be sufficient to complete the school construction project for which the grant is intended." (Italics omitted.) The grant of $27.7 million combined with an equal sum collected from local bonds, would have been sufficient to build the approved project. If the District happened to save money during construction, it would not need to return anything to the state and could use those funds for other projects. However, it would have been a direct violation of several statutory provisions for the District to have certified State Funds of $27.7 million was sufficient to complete construction but then only used $6 million to build the approved Project and spent the rest on whatever capital expenditures it wanted. Yet, this is exactly what happened in this case. The only difference is that here the grant funds belatedly arrived post-construction.

The regulation's language "as permitted in" was adequately conveyed by a common understanding of its terms. We decline to accept the District's unreasonable interpretation that all the state's money could be used for expenditures unrelated to the approved Project. "To justify departing from a literal reading of a clearly worded statute,

29

the results produced must be so unreasonable the Legislature could not have intended them.  [Citation.]  We cannot so conclude here." (*In re D.B.* (2014) 58 Cal.4th 941, 948.)

## DISPOSITION

The judgment is reversed and the matter remanded for further proceedings. We grant the appellants' and the respondent's requests for judicial notice.  Appellants shall recover their costs on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.